2021 UT App 97

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAVID GARCIA-FLORES,
Appellant.

Opinion
No. 20191012-CA
Filed September 23, 2021

Third District Court, West Jordan Department
The Honorable Dianna Gibson
No. 181401528

Sarah J. Carlquist, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

SENIOR JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.[1]

APPLEBY, Judge:

¶1     David Garcia-Flores appeals his two convictions of sexual
exploitation of a minor, which were based on child pornography
found on his computer. He argues that the district court should
have granted his motion to suppress statements from his police
interview because they were obtained in violation of his *Miranda*
rights. He also argues that his trial counsel rendered
constitutionally ineffective assistance by failing to object to the

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

admission of an allegedly highly prejudicial video that was not the basis for any of the charges against him. We affirm.

BACKGROUND

¶2     Police executed a search warrant at Garcia's[2] residence after obtaining information that a video of child pornography titled "Spermed Little Girls Mix" was being shared on a peer-to-peer network[3] from a computer there. The search produced one device with child pornography stored on it—a computer apparently belonging to Garcia. Garcia was charged with six counts of sexual exploitation of a minor based on photographs and videos found on this computer.

¶3     During execution of the search warrant, police also interviewed Garcia. The officer conducting the interview began by reading Garcia's *Miranda* rights and asking questions about his education level and English proficiency to ensure he understood the explanation of those rights. Garcia initially stated he was "absolutely" willing to proceed with the interview, but after some further questioning he asked, "[I]s it, uh, possible to have a lawyer[?]" Despite this apparent reluctance and without further prompting from the officer, Garcia continued to explain his situation, elaborating for some time on a "darkness" with

---

2. When identifying himself for the record at trial, the defendant used Garcia as his surname. We continue this usage for the sake of clarity.

3. Peer-to-peer networks allow users to "share files on their computer with others" over the internet, as well as to download files shared by others, and they "provide common forums for those who trade child pornography on the internet." *United States v. Shipton*, 5 F.4th 933, 935 (8th Cir. 2021).

which he was struggling. The officer, before asking any other questions, sought confirmation that Garcia wanted to continue talking to police, and Garcia again indicated he was "absolutely" willing to continue the interview. During the questioning that followed, Garcia admitted the computer was his, he was its sole user, and no one else knew his password. He also admitted he had downloaded and viewed child pornography.

¶4    Defense counsel moved to suppress nearly all evidence obtained during the police interview, arguing that Garcia's rights had been violated when police continued to talk with him after he had invoked his right to counsel. The district court denied the motion, reasoning that although Garcia had invoked his right to counsel, he then "knowingly and intelligently" waived it by immediately initiating further discussion with the officers. Thus, the State was permitted to introduce at trial the incriminating admissions Garcia made at the end of his interview.

¶5    Prior to trial, defense counsel also raised some concerns regarding files found on Garcia's computer that were not the basis for any of the charged offenses. Defense counsel agreed the file names were relevant and did not object to the State listing them among the items found on the computer, provided the images were not shown or characterized as child pornography. The State clarified its intention to present to the jury a visual depiction of only the files on which the charges were based, as well as the "Spermed Little Girls Mix" video (which was the impetus of the investigation but did not serve as the basis for any of the charges). After hearing these assurances, defense counsel said he was "fine with that."

¶6    Accordingly, at trial the State presented, as its Exhibit 1, portions of the "Spermed Little Girls Mix" video that originally led investigators to Garcia. Although it is unclear from the record which portions of the video were included in the

approximately half-minute excerpt played for the jury, investigative documents described the video as follows: "39 video segments of naked prepubescent girl's [sic] being orally sodomized (man's penis to girl's mouth) and vaginally raped. During all video segments, the men ejaculate into the girl's [sic] mouths and vaginas." In addition to Exhibit 1, the State presented the two videos and three photographs providing the bases for the six sexual exploitation charges.[4] These images and videos were of young girls in various stages of undress, exposing their buttocks, anuses, genitals, or breasts to the camera.

¶7    In addition to these several files, the State presented forensic information gathered from the two searches of Garcia's computer—those two searches being the initial forensic preview conducted during the execution of the search warrant and a more extensive search after the computer had been seized. For each search, the State submitted into evidence a list of the files that its analysis indicated had recently been opened on Garcia's computer. The State's evidence indicated that the two videos supporting two of the charges against Garcia had recently been opened, but that the three photographs underlying the remainder of the charges had not recently been opened.

¶8    As part of his defense, Garcia testified that he had been trying to download adult pornography and incidentally had received downloads of child pornography when doing so. He testified that when he realized he had files that seemed as though they might contain child pornography, he opened them to see whether they really did, and then deleted them: "I was

---

4. Because one of the files was a photograph depicting two minor girls, it served as the basis for two of the charges. The other four files each depicted one minor girl. Thus, the six charges were based on only five files.

going to go and check to see if it really was what it was, and if it was, I would delete it, which I did."

¶9 The jury convicted Garcia on two counts of sexual exploitation of a minor—specifically, the two counts related to the two video files for which there was evidence that the files recently had been opened—but acquitted him on the remaining four counts. He now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶10 Garcia appeals the district court's denial of his motion to suppress portions of his police interview. "We review a district court's ruling on a motion to suppress for correctness, and we review its factual findings in support of its ruling for clear error." *State v. Gardner*, 2018 UT App 126, ¶ 11, 428 P.3d 58. Therefore, "when a district court bases its ultimate conclusions concerning the waiver of a defendant's *Miranda* rights[] upon essentially undisputed facts, in particular the transcript of an officer's colloquy with the defendant, its conclusions present questions of law which we review under a correction of error standard." *Id.* (quotation simplified).[5]

¶11 Garcia also argues that his defense counsel at trial rendered ineffective assistance by failing to object to the State's efforts to present Exhibit 1 to the jury. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must

---

5. Although the district court did not base its decision on the written transcript of the interview, but on the sound recording of that interview, the court's conclusions were still based on "essentially undisputed facts," *see State v. Gardner*, 2018 UT App 126, ¶ 11, 428 P.3d 58 (quotation simplified).

decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

## ANALYSIS

### I. Motion to Suppress the Police Interview

¶12 Garcia argues that the district court should have granted his motion to suppress all statements made after he had invoked the right to counsel during his police interview. The parties agree that Garcia waived his *Miranda* rights at the beginning of the interview. The dispute thus lies in whether he later invoked his rights and, if so, whether he waived them a second time. The district court determined that Garcia had "unequivocally invoked his right to counsel" when he mentioned having an attorney present, but again waived that right immediately thereafter when he initiated further discussion with the officer. Garcia argues that his continued statements were not of the sort that would have constituted a second waiver. The State, on the other hand, argues that Garcia never even invoked his rights to counsel; alternatively, it argues that even if he initially did, his subsequent statements would have amounted to a second waiver of those rights. We agree with the State on both counts.

¶13 First, Garcia did not make an unequivocal request for an attorney. Once law enforcement officers have given the appropriate *Miranda* warnings and a suspect has effectively waived the right to counsel, officers are free to question the suspect. *See Davis v. United States*, 512 U.S. 452, 458 (1994). "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* The request for counsel must be unambiguous. *Id.* at 459. If the request is, instead, "ambiguous or equivocal in that a reasonable

officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," officers may continue questioning the suspect. *Id.*; *cf. Miranda v. Arizona*, 384 U.S. 436, 485 (1966) ("If [a suspect] is indecisive in his request for counsel, there may be some question on whether he did or did not waive [the right to] counsel."). In sum, "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis*, 512 U.S. at 461.

¶14  We disagree with the district court's determination that Garcia unequivocally invoked his right to counsel. The police interview began with the officer explaining Garcia's *Miranda* rights and asking him questions about his level of education and his proficiency in English to be certain that Garcia understood the explanation of those rights. The officer then asked, "So having that in mind, do you want to talk to us?" Garcia responded, "Umm, yeah, yeah absolutely, yeah." This was a clear waiver of the right to counsel. After the officer continued to discuss the case, including sharing information about the search warrant and explaining that the police were trying to determine who had downloaded child pornography at Garcia's residence, and after Garcia answered some other questions, the following exchange took place:

> [Garcia]: Can I say something?
>
> [Officer]: Sure
>
> [Garcia]: Is, is, is it, uh, possible to have a lawyer, um I-I want, I wanna be upfront with this—
>
> [Officer]: Ok.
>
> [Garcia]: —and I don't even know if that's gonna help me at all.

[Officer]: Ok.

[Garcia]: I don't know.

[Officer]: K.

Garcia then continued, "I don't want them to go through anything" and explained that he had "been suffering with darkness," that he was not happy about it, that he had "been fighting" it, and that he hated himself and had "contemplated suicide." During this time, the officer's comments were limited to brief responses of acknowledgement, such as "Ok" or "I understand."

¶15   Garcia's question about the possibility of having an attorney present did not amount to an unambiguous request for counsel. Rather, a reasonable officer in these circumstances would have, at most, understood that Garcia *might* be invoking the right to counsel with his question about getting a lawyer. *See Davis*, 512 U.S. at 462 (determining that a suspect saying "Maybe I should talk to a lawyer" was not an unambiguous request for counsel and did not require officers to stop the questioning). Accordingly, the officer was not required to stop questioning Garcia.

¶16   Of course, when a suspect's equivocal statement leaves an officer unsure of whether the suspect is requesting counsel, it is good practice for the officer to seek clarification. *See id.* at 461. "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Id.*

¶17   Indeed, that is what happened here. After Garcia's multiple spontaneous statements, the officer expressed some

sympathy and encouragement, but also said, "Now I need to make sure that you're in the right place and you're ok to talk with us about this because we wanna try to figure [it] out . . . ." Garcia did not directly reply but, instead, made more statements explaining his struggle, including the following: "I have this weird thing that I want it to go away"; "this is something that psychologically we can't get rid of"; "I do ask God for help"; "if there was something I could wish for it's to get rid of this"; and "you know, after I'm done, all this guilt comes in." Then the officer, after thanking him for his candor and expressing a desire to ask more questions, again attempted to clarify whether Garcia was willing to continue the interview:

> [Officer]: I need you to tell me that you're ok with talking to us—
>
> [Garcia]: Absolutely sir—
>
> [Officer]: —and answering some questions.
>
> [Garcia]: —absolutely [Officer].

Thus, the officer clarified that Garcia was not invoking his right to counsel and confirmed that he was willing to continue the conversation before the officer asked any further questions.

¶18 Second, even if we were to construe Garcia's question about counsel as an unambiguous request for an attorney, we also agree with the State's alternative argument that Garcia waived his right to counsel, for a second time, immediately after he posed this question. If "the accused himself initiates further communication, exchanges, or conversations with the police, then he has effectively waived his right to counsel and the interrogation may continue." *State v. Medina*, 2019 UT App 49, ¶ 13, 440 P.3d 846 (quotation simplified). Such a waiver exists if three conditions are met:

> First, it must be the accused, not the law enforcement officers, who initiates the conversations in which the incriminating statements are made. Second, the prosecution must show a knowing and intelligent waiver of the right to counsel. Third, the accused's statements must be shown by a preponderance of the evidence to have been voluntarily made.

*Id.* ¶ 14 (quotation simplified).

¶19    As to the first element, it is clear that Garcia—not the officer—initiated further conversation after the alleged invocation. We recognize that when the initiated conversation is "a routine conversation about something unrelated to the crime charged," it will not amount to a waiver. *Id.* ¶ 15 (quotation simplified). "In order for a defendant to initiate a conversation with authorities that will be held to constitute a willingness to talk about the charges without counsel, he or she must indicate a desire to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* ¶ 16 (quotation simplified). Garcia's conversation here was neither routine nor unrelated to the crime charged; instead, the comments were directly related to the ongoing investigation. *See id.* ¶¶ 20–21 (determining the first element was met when the defendant "spontaneously launched into an extensive and elaborate explanation for the circumstances" and drawing a parallel to another case in which the defendant "went on to—without invitation or provocation—explain himself and divulge further details regarding the crime charged"). Garcia stated that he did not want people looking through his things, spoke of the "darkness" with which he had been struggling, and lamented the consequences the investigation would have on his life—all of which was entirely unprompted. He now argues that such statements were simply "self-reflective statements" regarding mental health struggles he was experiencing and worries about how the charges would

affect his life even if he had done nothing wrong. We disagree. His other statements appear to indicate that the "darkness" with which he struggled was not simply a mental health challenge, but was instead connected to his consumption of child pornography. For example, his statements—that "this is not who I am, I'm a very ethical per[son], my parents raised me right," and "people look at, this kind of society like, people are monsters and, you don't even know, like it's, I cry sometimes"— appear directly related to the subject of the investigation. Furthermore, his statements were not introspective, but were directed toward the officer—for example, "You understand that[?]" and "You think it's easy? You think it's something we choose?" Thus, it is apparent from the record that Garcia initiated the continued conversation with the investigating officers.

¶20   As to the second element, "the determination of whether a waiver of the right to counsel was made knowingly and intelligently depends upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* ¶ 23 (quotation simplified). Garcia was in his late 20s, had attended two years of college, was bilingual, and just a few minutes earlier had been informed of—and affirmed that he understood—his *Miranda* rights. If Garcia initially understood his rights and what he would waive by talking to police, he certainly retained that understanding a few minutes later. Yet he continued talking to the officer, demonstrating that he was willing to talk notwithstanding his right not to. *See Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."). And again, before asking any other questions, the officer twice sought clarification from Garcia that he was

comfortable proceeding with the interview. Therefore, we agree with the district court that Garcia knowingly and intelligently waived his rights.

¶21    Finally, as to the third element of voluntariness, "the ultimate inquiry is whether physical or psychological force or other improper threats or promises prompted the accused to talk when he otherwise would not have done so." *Medina*, 2019 UT App 49, ¶ 29 (quotation simplified). Immediately after the officer responded "Ok" when Garcia asked about the possibility of counsel being present, Garcia initiated a two-minute explanation of his situation, with the officer only interjecting words such as "Ok" and "yeah" along the way. Garcia's statements were unprompted and not the result of any force—or even any questioning—on the officer's part. Indeed, when the officer subsequently tried the first time to clarify whether Garcia was willing to continue talking with him, Garcia did not directly answer and shared even more information. And when the officer asked for clarification a second time, Garcia confirmed that he was "absolutely" willing to continue talking with the officer. Those clarifying questions were the only questions the officer asked until Garcia specifically stated his willingness to talk. Therefore, we see no indicia of Garcia's waiver being in any way nonvoluntary.

¶22    Garcia resists this conclusion, arguing that although the officer did not ask any questions until after he had received another assurance that Garcia was "absolutely" willing to talk, the officer made other statements in the interim that amounted to a "well-worn interrogative technique" in which the officer displays confidence in the suspect's guilt and makes comments as to why—not whether—he committed the crime. Although we do not necessarily agree with this characterization, Garcia's argument on this matter is unavailing because the statements he finds questionable were made much later in the dialogue, after Garcia had already waived his right to counsel by continuing to

speak with the officer. After Garcia's reference to counsel, the officer made no statements aside from one-word interjections such as "Ok" and "yeah" for a solid two minutes while Garcia kept talking and explaining his struggles with the "darkness." The officer employed no force, psychological or otherwise, to induce Garcia to talk. And by the time the officer made additional statements a few minutes later, waiver had already occurred.

¶23   In sum, Garcia's question regarding the presence of an attorney—"is it, uh, possible to have a lawyer"—did not amount to an unambiguous request for counsel and did not invoke his right to counsel. And even if Garcia's question had invoked the right, we agree with the district court that his subsequent voluntary initiation of further dialogue constituted a second waiver. We therefore see no error in the court's denial of Garcia's motion to suppress.[6]

## II. Ineffective Assistance of Counsel

¶24   Garcia argues that his defense counsel rendered ineffective assistance when failing to object to the admission of Exhibit 1. To succeed on his ineffective assistance of counsel claim, Garcia must show both that his defense counsel's performance was "deficient" and that it "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

---

6. Garcia also argues that the cumulative effect of multiple errors requires reversal. But because he makes only two claims of error and we determine that the first is not well taken, the cumulative error doctrine does not apply and we need not address cumulative prejudicial impact. *See State v. Galindo*, 2019 UT App 171, ¶ 17 n.4, 452 P.3d 519 ("There are no errors to accumulate here, rendering the cumulative error doctrine inapplicable in this case.").

¶25     Deficient performance is that which is unreasonable based on "prevailing professional norms." *Id.* at 688. We are persuaded that under the facts of this case, the failure to object to Exhibit 1 was deficient performance. Although Exhibit 1 was relevant because it was the video that triggered the investigation, its probative value was limited because it was not the basis for any of the charges against Garcia. Additionally, according to its description in the search warrant application, Exhibit 1 was significantly more repulsive in nature than the child pornography that underlay the charges, thus making its danger of unfair prejudice very high in comparison to its probative value. Therefore, an objection under rule 403 of the Utah Rules of Evidence almost certainly would have been successful, *see* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."), and would have prevented the jury from seeing the highly prejudicial footage. We are convinced that under these circumstances, the failure to object to the admission of Exhibit 1 "fell below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 688.

¶26     But "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Garcia has not met his burden to show prejudice under the facts of this case.

¶27     To evaluate prejudice under *Strickland*, "we assess counterfactual scenarios—that is, what would have happened but for the ineffective assistance." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203. The counterfactual analysis requires us "to consider a hypothetical—an alternative universe in which the

trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86. Where the error resulted in the admission of evidence that should have been excluded, we ask "whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." *State v. Leech*, 2020 UT App 116, ¶ 67, 473 P.3d 218. Here, we assess the likely outcome of a trial in which Exhibit 1 was excluded leaving the jury to consider the remainder of the prosecution's case. *See id.*

¶28    Because the State's case is unusually strong, we are not convinced that even if Exhibit 1 had been kept from the jury, there is a reasonable probability the result would have been better for Garcia. The files underlying the two charges of which he was convicted were on Garcia's computer and there was evidence that each had recently been opened. And most importantly, Garcia confessed to police that he had viewed child pornography, describing in some detail his child pornography addiction, the search terms he used to find child pornography, and his intentional downloading and viewing of child pornography. Of course, Garcia testified somewhat differently at trial, but his testimony was still that the computer was his, that he downloaded the child pornography, and that he opened the files that were on the forensic lists identifying recently opened files. The changes between his trial testimony and his earlier statements to police were that the downloads were unintentional and he had opened the videos only to verify that they were child pornography and should be deleted. But, as the questions on cross-examination highlighted, this explanation was suspect, not only because it contradicted what he told officers during his interview, but also because many of the recently opened files had highly graphic and offensive names clearly indicative of child pornography. Considering the strength of the State's case and the evidence supporting the charge that Garcia knowingly possessed or intentionally viewed the two files on which his

convictions rest, we do not see a reasonable probability of a different result in the absence of the admission of Exhibit 1, and Garcia's ineffective assistance claim therefore fails.[7]

---

7. Garcia argues that admission of such inflammatory material is always prejudicial, relying on *United States v. Cunningham*, 694 F.3d 372 (3d Cir. 2012), and *United States v. Loughry*, 660 F.3d 965 (7th Cir. 2011). But we do not agree that these cases support such a sweeping proposition.

First, the procedural footing of these cases is different. The errors at issue in these federal cases had been objected to by defense counsel and preserved for appeal. *Cunningham*, 694 F.3d at 379–80; *Loughry*, 660 F.3d at 970. Thus, the question was whether the government had carried its burden to prove that the errors were harmless. *Cunningham*, 694 F.3d at 391–92; *Loughry*, 660 F.3d at 975. *See generally United States v. Olano,* 507 U.S. 725, 734–35 (1993) (explaining that, under the Federal Rules of Criminal Procedure, the government bears the burden on appeal to show that a preserved error was harmless); *State v. Leech*, 2020 UT App 116, ¶ 43 n.7, 473 P.3d 218 (explaining the differences between the federal and state rules regarding the placement of appellate burdens of persuasion on preserved and unpreserved claims of error). But the issue before us admittedly was not preserved and instead is considered in the context of an ineffective assistance of counsel claim, in which the defendant has the burden to show that an error was *not* harmless.

Second, the harmless error standard applied in those federal cases is substantively different from the prejudice standard we must apply in ineffective assistance cases. Under *Cunningham*, "the test for harmless error is whether it is highly probable that the error did not contribute to the judgment. This high probability requires that the court possess a sure conviction that the error did not prejudice the defendant." 694 F.3d at 391–

(continued…)

CONCLUSION

¶29    The district court did not err in denying the motion to suppress portions of the police interview. And because Garcia has not carried his burden of demonstrating prejudice from the admission of Exhibit 1, his claim of ineffective assistance of counsel fails. Therefore, we affirm.

———————

(…continued)

92 (quotation simplified). But when assessing prejudice under an ineffective assistance of counsel claim, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, [the question is] whether it is reasonably likely the result would have been different." *Harrington v. Richter*, 562 U.S. 86, 111 (2011) (quotation simplified); *accord State v. Gallegos*, 2020 UT 19, ¶ 64, 463 P.3d 641. That is, "'[t]he likelihood of a different result must be substantial, not just conceivable.'" *Gallegos*, 2020 UT 19, ¶ 64 (quoting *Harrington*, 562 U.S. at 112).

Furthermore, although the presentation of child pornography in *Cunningham* and *Loughry* was not harmless, we do not see that these cases support a broad assertion that improperly admitted child pornography can *never* be harmless. *See Cunningham*, 694 F.3d at 390–92 (determining only that "at least two" of the seven very disturbing child pornography video excerpts were "patently prejudicial"); *Loughry*, 660 F.3d at 975 (recognizing that the harmlessness analysis rested not just on the inflammatory nature of the child pornography, but also on the weakness of the prosecution's case).