**2024 UT App 190**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LUCAS MARC DEPREY,
Appellant.

Opinion
No. 20200253-CA
Filed December 27, 2024

Third District Court, West Jordan Department
The Honorable Dianna Gibson
No. 171404154

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

ORME, Judge:

¶1      Lucas Marc Deprey appeals his convictions for murder and obstruction of justice, arguing he was entitled to a mistrial after a detective (Detective) testified that, during interrogation, Deprey admitted he was a felon who could not own a gun. Deprey also argues that statements made during that interrogation should have been suppressed because Detective discouraged him from obtaining counsel. Relatedly, he argues his defense counsel (Counsel) was constitutionally ineffective for failing to argue an additional ground for suppression: Detective's inadequate warning about Deprey's right to remain silent. Deprey further argues the trial court committed plain error in submitting a flawed instruction to the jury and Counsel provided ineffective

assistance in not objecting to it. We disagree on all fronts and affirm Deprey's convictions.

BACKGROUND[1]

¶2    Deprey was waiting in a parking lot for his mother to pick him up when he saw a car drive in. Deprey was "[s]cared" because he recognized the driver (Driver) as a rumored cartel member Deprey knew had sold drugs to his friend (Friend). Deprey claimed at trial that he had heard Driver threaten to kill Friend because Friend had not paid Driver for drugs. He asserted that he had not heard from Friend for "a couple days" by the time he saw Driver in the parking lot. Deprey also claimed he had heard a rumor that Driver said Deprey "was next" because he had been present when Driver threatened Friend. But security footage of the parking lot showed Deprey approach the passenger side of Driver's car. According to Deprey, Driver told him, "Stop asking about [Friend] or I'll kill you too." Deprey said he then saw Driver reach across his body. The security footage showed the driver-side window of the car shatter as Deprey "pulled out [his] gun, fired one shot and just ran."

¶3    Driver's car then lurched forward, exiting the parking lot and crossing lanes of traffic before hitting several cars that were stopped at an intersection. Driver, who was found unconscious inside his car with a gunshot wound to the head, was declared dead at the hospital. Officers found drugs as well as two folding knives inside Driver's car—one knife in the driver-door pocket and the other on the floorboard near the pedals. A 9-millimeter shell casing and bullet were later found in the parking lot.

---

1. "We review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Fraughton*, 2024 UT App 118, n.1, 556 P.3d 118 (quotation simplified).

¶4 Meanwhile, Deprey fled the scene, discarding his jacket and hat in a nearby dumpster before getting on a light rail train. He briefly visited another friend's motel room before meeting up with his mother, who dropped him off at a truck stop from which Deprey then hitchhiked to Oregon. Once there, he reached out to a counselor at a Utah youth treatment center he had previously stayed at, asking the counselor to send him money. Deprey asked the counselor whether he had seen news of the shooting and told the counselor he had shot Driver. Deprey said Driver had robbed Friend, so he "splattered his brains." He said, "Worst part is the dude was cartel." He also admitted, "I was trying to prove myself," and he mentioned that the interaction "was supposed to be a lick"—which the counselor testified meant a robbery—but Deprey shot Driver instead.

¶5 Oregon police eventually located and arrested Deprey. Utah officers, including Detective, then traveled to Oregon to interview him. At the beginning of the interrogation, Detective informed Deprey that he was a person of interest in the case and said, "I just want to advise you of your rights just so you're aware of them." Deprey muttered something about having heard the warnings "a million times." Detective then said that he had to "go over" Deprey's rights as a "technicality" so that Deprey would "know [he did not] have to talk to" Detective that day. Detective told Deprey,

> [T]his is voluntary. Anything you say is going to be used in my investigation and that investigation will be used against you in court. You have a right to talk to an attorney and have one present with you while we question you. If you can't afford an attorney the courts will provide one for you. If you decide to talk to me today, you can stop at any time and request an attorney at the same time.

Deprey indicated that he understood these rights. Detective then asked, "Okay having that in mind, do you wish to talk to me

today?" Deprey said, "Yeah I'll hear what you have to say and I'll answer what I feel comfortable answering."

¶6    Deprey initially denied being involved in the shooting, saying he had been in the area and had merely heard a gunshot. He claimed that after his mother picked him up, he realized he had not checked in with his probation officer, so to avoid the consequences and to get a "change of scenery," he fled to Oregon.

¶7    At one point during the interrogation, Deprey said, "If I put a pause on this to wait for my attorney, how long would that take?" Detective answered, "I have no idea. I have no idea like I said that's a right of yours." Deprey said, "I know it's a right of mine." Detective then went on to explain that he was not "out here to judge anybody" and that "the District Attorney in Salt Lake" would understand Deprey's circumstances. He told Deprey that admitting what had happened would make a "huge difference" with a judge and jury. He also told Deprey he was "more than welcome to get a lawyer" but that the lawyer would "definitely" tell the police to "pound sand"—preventing Deprey from telling his side of the story. Deprey observed, "I also see you highly encouraging me not to have a lawyer," to which Detective responded, "No, no I just want you to understand."

¶8    Deprey eventually asked, unprompted, "And what about the weapon?" After Detective tried to get Deprey to discuss the gun he used to shoot Driver, Deprey said, "How am I supposed to get a hold of a gun if I'm a felon?" After Detective confronted Deprey with other evidence—including surveillance footage showing the path he took after the shooting and the jacket and hat he had discarded in the dumpster, which had been retrieved by the police—Deprey admitted to "talking" with Driver about Friend. Detective observed "tears welling up in" Deprey's eyes. And Deprey finally said, "I'm guessing you guys have the admission of guilt paper to sign?" On a witness statement form, Deprey wrote,

I was in Check City waiting for my mom to give me a haircut when I saw a red car pull up and I recognized a dealer that I had heard had a GL[2] on my friend's head. I went to talk to him and ask what that was about and he said "Mind your business unless you want to get killed too." So I shot him too. There, are you happy now? Give me my time or death sentence. I'm ready to do my time. Bring it. I'm ready to do my time. I'm tired of looking over my shoulder.

Deprey went on to tell Detective that Driver had been "threatening to kill" Deprey so Deprey wanted to "get [Driver] first." He stated he did not see Driver pull out a gun.

¶9 Deprey was charged with murder, possession of a firearm by a restricted person, and obstruction of justice. Before trial, based on the stipulation of the parties, the trial court agreed to bifurcate the charges so that the murder and obstructing justice charges were tried to the jury and the gun possession charge was tried to the bench. Deprey also filed a motion "to suppress statements made by [him] after his assertion of his right to counsel." He acknowledged he had initially waived his *Miranda* rights and that his later mentions of a lawyer were ambiguous, but he argued he was nonetheless entitled to suppression because Detective "actively dissuaded" him from seeking counsel. The court denied the motion to suppress, concluding that Deprey had waived his *Miranda* rights at the beginning of the interrogation when he agreed to speak to Detective and that his later "admittedly ambiguous references to counsel" were not "a subsequent clear invocation of" that right.

---

2. During the interrogation, Deprey clarified that "GL" meant "green light," which Detective later explained at trial "means that somebody has given the go [a]head to kill somebody or commit any kind of harm on them."

¶10 At the ensuing four-day trial, the State presented numerous witnesses, including Detective. While questioning Detective about his interrogation of Deprey, the prosecutor asked, "What did [Deprey] initially tell you about whether he would be carrying a weapon?" Detective answered,

> Initially told me that, you know, he doesn't have a gun, because, again, he asked me, "Where is the gun?" He also made a comment later in the interview that he's a felon and isn't allowed to carry a gun, so he wouldn't have one.

Counsel did not object to this statement. On cross-examination, Detective also admitted that in reading Deprey his *Miranda* rights, he had not used the "exact words" from *Miranda v. Arizona*, 384 U.S. 436 (1966), regarding Deprey's right to remain silent.

¶11 After Detective's testimony, Counsel moved for a mistrial based on Detective's reference to Deprey's status as a felon who could not own a gun. Counsel pointed out that the trial had been bifurcated so that the issue of whether Deprey could legally possess a gun would not be before the jury. Counsel conceded that the prosecutor had not elicited this testimony on purpose, but he contended that "the entire courtroom atmosphere changed" after Detective's statement and that it was not made in passing. And, noting the jury had asked the court a question about Deprey's ability to legally own a firearm during a previous witness's testimony, Counsel argued Detective's improper statement would have caught the jury's attention. Counsel argued that "the only solution" was a mistrial.

¶12 The court denied Deprey's motion, finding the "statement was not elicited by the prosecution intentionally. It was made in passing. It was isolated. There was no objection when the statement was made. No sidebar was requested. No further questions were asked." But the court did find that the statement was "not vague." And while the court noted that "there certainly was acknowledgment amongst the lawyers and the judge" of the

statement, the court "did not notice that that statement had any more impact on the jury than any other evidence that [had] been presented thus far in the case." Instead of granting the mistrial, the court offered to give a curative instruction and later directed the jury not to consider Detective's statement "for any purpose."

¶13 Deprey then took the stand. He testified that he was "[s]cared" to see Driver because of the supposed "green light" on Friend and Driver's alleged threats against Deprey. Counsel asked Deprey, "Prior to walking up to the car and such, were you having emotional distress from what you'd heard about [Friend] and the threats that you heard about against you?" Deprey testified he "was anxious" and had "cool[ed] off a little bit," although seeing Driver "heightened [his] anxiety." He testified that he saw Driver reaching across his body and immediately shot him.

¶14 At the close of trial, a jury instruction titled "Special Mitigation—Manslaughter" stated that the murder charge could be reduced to manslaughter if the jury found

> beyond a reasonable doubt, based on the evidence, each and every one of the following elements:
>
> 1.    the defendant, Lucas Marc Deprey, is GUILTY of Murder,
>
> *and*
>
> 2.    the defendant proved by a preponderance of the evidence that he was under extreme emotional distress and there was a reasonable explanation for the distress.

The first sentence of the next instruction also addressed extreme emotional distress, stating, "The burden lies with the defendant to prove 'extreme emotional distress' by a preponderance of the evidence." So instructed, the jury found Deprey guilty of murder

and obstruction of justice. The trial court subsequently found him guilty of the gun possession charge.

¶15    Deprey appeals.

ISSUES AND STANDARDS OF REVIEW

¶16    On appeal, Deprey argues the trial court erred when it denied his motion for a mistrial—"a decision we review for abuse of discretion." *State v. Whytock*, 2020 UT App 107, ¶ 14, 469 P.3d 1150, *cert. denied*, 481 P.3d 1043 (Utah 2021).

¶17    Next, Deprey makes two arguments regarding his motion to suppress. First, he argues that because Detective actively discouraged him from seeking counsel, the court erred in denying his motion. "We review a district court's ruling on a motion to suppress for correctness, and we review its factual findings in support of its ruling for clear error." *State v. Garcia-Flores*, 2021 UT App 97, ¶ 10, 497 P.3d 847 (quotation simplified), *cert. denied*, 502 P.3d 271 (Utah 2021). Second, Deprey argues Counsel was ineffective in failing to raise an additional ground for suppression based on Detective's purportedly flawed *Miranda* instructions regarding his right to remain silent. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Perkins*, 2024 UT App 101, ¶ 11, 554 P.3d 363 (quotation simplified).

¶18    Deprey also faults both the trial court and Counsel for an erroneous jury instruction regarding the burden of proof on his extreme emotional distress defense. He argues the court plainly erred in so instructing the jury and that Counsel was ineffective in failing to object to the instruction. "Plain error is a question of law reviewed for correctness." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (quotation simplified), *cert. denied*, 485 P.3d 943 (Utah 2021). And we evaluate ineffective assistance claims as a matter of law. *Perkins*, 2024 UT App 101, ¶ 11.

ANALYSIS

I. Motion for Mistrial

¶19    In questioning Detective about his interrogation of Deprey, the prosecutor asked, "What did [Deprey] initially tell you about whether he would be carrying a weapon?" As previously noted, Detective answered,

> Initially told me that, you know, he doesn't have a gun, because, again, he asked me, "Where is the gun?" He also made a comment later in the interview that he's a felon and isn't allowed to carry a gun, so he wouldn't have one.

Counsel made no objection, instead waiting until after Detective's testimony to move for a mistrial. In doing so, Counsel pointed out that the trial court had already bifurcated the possession charge to keep this information from the jury, and he asserted that as soon as Detective made this statement, "the entire courtroom atmosphere changed." Counsel argued "the only solution" was a mistrial. The trial court denied the motion, offering a curative instruction instead. Deprey argues this was an abuse of discretion. We disagree.

¶20    "A mistrial is strong medicine," and "we afford a high level of deference to a trial court's decision because trial courts are in an advantaged position to determine the impact of courtroom events on the total proceedings." *State v. Kufrin*, 2024 UT App 86, ¶ 37, 551 P.3d 416 (quotation simplified). "In view of the practical necessity of avoiding mistrials and getting litigation finished, a trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Whytock*, 2020 UT App 107, ¶ 16, 469 P.3d 1150 (quotation simplified), *cert. denied*, 481 P.3d 1043 (Utah 2021). "Accordingly, we will not reverse the court's decision unless it is plainly wrong in that the incident so likely influenced the jury that the defendant

cannot be said to have had a fair trial." *Kufrin*, 2024 UT App 86, ¶ 37 (quotation simplified).

¶21    "A mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *Id.* ¶ 38 (quotation simplified). For instance, in *Whytock*, a pretrial order excluded evidence of the defendant's criminal history, but a witness later testified that the defendant had gotten "out of jail on ankle monitor." 2020 UT App 107, ¶ 15 (quotation simplified). We concluded the trial court's denial of a mistrial was not an abuse of discretion because the improper statement "was not voluntarily elicited" and was an "isolated, off-hand remark" that the State did not mention again during trial, and "the trial proceedings continued thereafter without interruption." *Id.* ¶ 21. Further, the court offered a curative instruction. *Id.* Similarly, in *Kufrin*, the trial court denied a mistrial motion after a detective mentioned the defendant's "previous cellmates." 2024 UT App 86, ¶ 29 (quotation simplified). While agreeing that the statement was "unfortunate," we affirmed, concluding the remark was "made in passing," was "not intentionally elicited by the State," and was an "ambiguous . . . two-word allusion" that the State made "no further mention of." *Id.* ¶¶ 36, 42.

¶22    Here, the trial court found that Detective's "statement was not elicited by the prosecution intentionally," in part because Counsel conceded as much. The statement was also made in passing and, as the court found, was isolated, as the prosecutor immediately pivoted by asking an unrelated question after Detective's improper response. Counsel also chose not to object to that response when it happened, opting instead to later move for a mistrial. This allowed the trial to continue without interruption, avoiding any undue emphasis on the statement. The issue did not come up again during trial. And while the trial court found that the statement was "not vague," and that "the lawyers and the judge" had "certainly noted" it, the court "did not notice that that statement had any more impact on the jury than other evidence that [had] been presented" in the case up to that point.

¶23    Nonetheless, Deprey argues Detective's statement was not innocuous because it harmed his self-defense and extreme emotional distress arguments. Deprey points to *State v. Craft*, 2017 UT App 87, 397 P.3d 889, where in determining whether Craft's counsel was ineffective for failing to argue for a mistrial, we concluded that a detective's testimony that Craft's codefendants had placed him at the scene of the crime was not innocuous because his "entire defense was based on his assertion that he was not present at the scene of the crime." *Id.* ¶¶ 25–26. There, the detective's statement "did not involve a peripheral issue," it "pertained to the heart of the central factual issue the jury was tasked with resolving—whether Craft was the man the witness saw in his house on the night of the crime." *Id.* ¶ 26. This is not the case here. As Deprey himself points out in his opening brief, "the reasonableness of . . . using the gun was the central issue before the jury"—not whether he could legally possess the gun. And, as we discuss below, Deprey did not even argue extreme emotional distress to the jury. *See infra* ¶ 32. Thus, Detective's statement did not interfere with Deprey's defenses.

¶24    Unfortunate though Detective's statement was, we cannot say that it so influenced the jury that it prevented Deprey from receiving a fair trial. Given the high level of deference owed, it was not an abuse of the trial court's discretion to avoid the strong medicine of a mistrial and to instead deal with the problem by means of a curative instruction.

## II. Motion to Suppress

¶25    Deprey argues incriminating statements he made during his interrogation by Detective should have been suppressed because his *Miranda* rights were violated. He argues the trial court erred in denying his motion to suppress because Detective "discouraged him from getting an attorney." And he argues Counsel provided ineffective assistance by failing to raise an additional ground for suppression based on what he views as Detective's flawed articulation of Deprey's right to remain silent. Neither argument is availing.

A.    Right to Counsel

¶26    First, Deprey argues the trial court should have granted his motion to suppress because Detective "actively dissuade[d]" and "discouraged him from getting an attorney." We disagree. If a "suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Davis v. United States*, 512 U.S. 452, 458 (1994). "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* This request must be unambiguous. *See id.* at 459. And "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the questioning may continue. *Id.* (emphasis in original). Thus, "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id.* at 461.

¶27    It is undisputed that Deprey initially waived his right to counsel. He later asked Detective, "If I put a pause on this to wait for my attorney, how long would that take?" This was not a clear request for counsel. *See State v. Garcia-Flores*, 2021 UT App 97, ¶ 23, 497 P.3d 847 (holding that a defendant asking, "Is it, uh, possible to have a lawyer?" was an ambiguous request for counsel) (quotation simplified), *cert. denied*, 502 P.3d 271 (Utah 2021). Nor did Detective dissuade or discourage Deprey from invoking that right. After Deprey asked how long it would take to wait for an attorney, Detective said, "I have no idea. I have no idea like I said that's a right of yours."[3] He later told Deprey he was

―――――――――――――――――――――――

3. In *Davis v. United States*, 512 U.S. 452 (1994), the United States Supreme Court recognized that, "[o]f course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or

(continued…)

"more than welcome to get a lawyer," although he indicated the lawyer would likely prevent Deprey from being able to continue telling his story. Despite this comment, Detective did not actively dissuade or discourage Deprey from seeking counsel; indeed, Detective maintained throughout the interview that Deprey had the right to an attorney, indicating he "want[ed Deprey] to understand" that Deprey had this right. Thus, Deprey's right to counsel was not violated and the trial court did not err in denying his motion to suppress on this basis.

### B. Right to Remain Silent

¶28 Second, Deprey argues Counsel was ineffective in failing to argue for suppression based on Detective's purportedly inadequate articulation of Deprey's right to remain silent. To prove ineffective assistance, Deprey "must demonstrate both that Counsel's performance was deficient and that Counsel's deficient performance was prejudicial." *State v. Cook*, 2017 UT App 8, ¶ 11, 391 P.3d 391 (quotation simplified). "Failing to file a futile motion does not constitute ineffective assistance of counsel." *Id.* (quotation simplified). In this case, Counsel was not ineffective because a motion to suppress based on Detective's articulation of Deprey's right to remain silent would have been futile.

¶29 "While *Miranda* is recognized as obligating police to follow certain procedures in their dealings with an accused, the decision did not prescribe that law enforcement officers adhere to a verbatim recitation of the words of the opinion." *State v. Werner*, 2003 UT App 268, ¶ 7, 76 P.3d 204 (quotation simplified). *See also State v. Smith*, 2019 UT App 141, ¶ 23, 449 P.3d 971 ("*Miranda* warnings need not be repeated word for word."), *cert. denied*, 456 P.3d 390 (Utah 2019). "In reviewing the adequacy of *Miranda* warnings, our inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Smith*, 2019

---

not he actually wants an attorney." *Id.* at 461. But the Court "decline[d] to adopt a rule requiring officers to ask clarifying questions" in such situations. *Id.*

UT App 141, ¶ 23 (quotation simplified). Detective informed Deprey that although it was a technicality, they needed to "go over" Deprey's rights so that Deprey would "know [he did not] have to talk to [Detective]" that day. Detective then told Deprey, "[T]his is voluntary. . . . If you decide to talk to me today, you can stop at any time and request an attorney at the same time." He then asked Deprey whether he wanted to speak with him. Together, these statements clearly informed Deprey—who apparently indicated he had heard these warnings "a million times"—that he did not have to speak to Detective; in other words, that he could remain silent. Thus, Detective adequately apprised Deprey of this right. Because urging otherwise would have been futile, Counsel did not perform deficiently in failing to argue this ground in support of the motion to suppress. Accordingly, Deprey's ineffective assistance claim fails.

### III. Jury Instruction

¶30   Finally, Deprey takes issue with the jury instruction that, with our emphasis, read:

> You cannot convict the defendant of this offense unless you find *beyond a reasonable doubt*, based on the evidence, each and every one of the following elements:
>
> 1.   the defendant, Lucas Marc Deprey, is GUILTY of Murder,
>
> *and*
>
> 2.   the defendant proved *by a preponderance of the evidence* that he was under extreme emotional distress and there was a reasonable explanation for the distress.

Deprey argues the instruction improperly stated his burden of proof, stacking the "beyond a reasonable doubt" standard atop

his burden to prove extreme emotional distress "by a preponderance of the evidence." He argues the trial court plainly erred in submitting this flawed instruction to the jury. Alternatively, he argues Counsel provided ineffective assistance in failing to object to it.

¶31  The jury instruction is indeed problematic given the conflicting statements regarding the burdens of proof. But because both ineffective assistance of counsel and plain error require Deprey to show that he was prejudiced by the jury instruction—i.e., that "absent the error, there is a reasonable likelihood of a more favorable outcome." *State v. Popp*, 2019 UT App 173, ¶ 36, 453 P.3d 657 (quotation simplified), *cert. denied*, 485 P.3d 943 (Utah 2021). *See id.* ¶ 40 (stating that "the prejudice test is the same whether under the claim of ineffective assistance or plain error" and that "failure to meet the plain error requirement of prejudice means that the defendant likewise fails to meet the required showing under the infective assistance of counsel standard") (quotation simplified). While we agree that the instruction nonsensically stacked burdens of proof for extreme emotional distress, Deprey cannot show that he was prejudiced thereby.

¶32  Deprey relied on self-defense arguments throughout trial—not extreme emotional distress. And he presented scant evidence to support such an argument. Counsel did ask Deprey, "Prior to walking up to the car and such, were you having emotional distress from what you'd heard about [Friend] and the threats that you heard about against you?" Deprey answered that he "was anxious" and had "cool[ed] off a little bit," although seeing Driver "heightened [his] anxiety." But Counsel did not develop this further and did not argue extreme emotional distress to the jury in opening statements or closing arguments. Even if he had, the instruction immediately following the one at issue here correctly informed the jury, with our emphasis, that "[t]he burden lies with the defendant to prove 'extreme emotional distress' *by a preponderance of the evidence*."

¶33 Simply stated, this case was not about extreme emotional distress. Even had the jury instruction been correct, we see no likelihood of a different outcome for Deprey. Thus, Deprey cannot show he was prejudiced in this regard, and his claims of plain error and ineffective assistance fail.[4]

CONCLUSION

¶34 Although Detective's statement about Deprey's legal inability to own a gun was unfortunate, the trial court did not abuse its discretion in denying Deprey's motion for a mistrial. Neither of Deprey's arguments regarding suppression of his statements made during his interrogation are availing. And flawed as the challenged jury instruction regarding extreme emotional distress was, Deprey cannot show he was prejudiced by it.

¶35 Affirmed.

_____

4. Deprey also argues all these alleged errors cumulate to warrant reversal. But because we conclude that none of his claims constitute error, there is nothing to cumulate, and his cumulative error claim likewise fails. *See State v. Kufrin*, 2024 UT App 86, ¶ 64 n.5, 551 P.3d 416.