2025 UT App 60

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SATEKI MALANI LATU,
Appellant.

Opinion
No. 20220677-CA
Filed May 1, 2025

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 191912602

Emily Adams and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown and Michael Gadd,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1      Sateki Malani Latu met Kelli[1] on a dating website. The two met in person on three occasions. After their third meeting, Kelli reported to law enforcement that Latu had raped her. Latu denied raping Kelli, but he did essentially admit to conduct that constituted forcible sexual abuse. Seemingly in agreement with Latu about the facts, the jury convicted Latu of the crime of forcible sexual abuse, which the jury had been instructed on as a lesser included offense of rape. Latu appeals, arguing that a detective (Detective) should not have been allowed to offer testimony about the commonness of inconsistent testimony of

---

1. A pseudonym.

victims in general. Latu claims this testimony improperly enhanced Kelli's credibility. We affirm Latu's conviction because he cannot demonstrate that the challenged testimony prejudiced him where he admitted the elements of the crime for which he was convicted—an admission that rendered Kelli's credibility an insignificant factor in the case.

BACKGROUND

¶2     Latu and Kelli met on a dating website in 2019. After communicating through the website, Latu and Kelli met in person on three occasions.

¶3     The first meeting occurred when Kelli was moving into a new apartment. Kelli, finding herself without enough help to unload the moving truck, messaged Latu to ask if he would be interested in helping her move. Latu responded that he would "be happy to help" and went over for a few hours to help unload the truck. At trial, Kelli testified that there was no physical or romantic contact between the two of them on this occasion.

¶4     The second meeting occurred when Latu returned to Kelli's apartment a few days later. Kelli and Latu had been texting about an extra refrigerator Kelli had, which Latu was going to pick up from her. When Latu arrived "he was really upset and crying" about the recent passing of his wife. Kelli invited him in and offered him a drink. The two "talked for quite a while" about Latu's late wife. After talking for some time, the two began kissing. The kissing progressed to the point that Latu and Kelli talked about having sex, but ultimately, they agreed that they would not have sex on that occasion and that they should just be friends. Kelli told Latu that he could "pick up the fridge another day," and Latu left.

¶5     Kelli's and Latu's accounts differ when it comes to their third encounter. According to Kelli, Latu came over to pick up the

fridge and was standing outside her front door. While Kelli went inside to get the keys to the garage where the fridge was stored, Latu entered her apartment. When Kelli returned to find Latu inside her apartment, Latu began explaining to Kelli that they "were supposed to be a family" and that he was going to take Kelli and her son to Tonga. When Kelli told Latu that this made her uncomfortable, Latu became upset. An argument ensued, and Latu pushed Kelli onto the couch. Latu was "very forceful and very upset," and Kelli was "really scared." Kelli told Latu to "[p]lease leave." But instead of leaving, Latu held Kelli down, pulled off her pants and underwear, and pulled off his own pants and underwear. Kelli specifically testified that Latu's penis penetrated her vagina and he ejaculated inside her, all the while Kelli was asking him to stop and trying to push him away.

¶6 A few days after their third meeting, Latu left for a planned trip to Tonga. Not long thereafter, Kelli told a friend and then her ex-husband about the incident. Ultimately, she reported the incident to the police, and Latu was charged with one count of rape.

¶7 When Kelli initially reported the incident, she spoke with detectives in a recorded interview at the police station. In that interview Kelli made several statements that were inconsistent with Latu's story and with her own eventual trial testimony. She said the rape occurred on the same day that Latu helped her move, though she would later testify that it happened during their third meeting. She said she had met Latu only once, though she would later testify they met three times. She said that it was a "literal fight" to get Latu off her, though later she did not mention a struggle. She also said that she communicated with Latu only through the dating website on which they had met, though she would later testify that they exchanged text messages. Kelli admitted that her initial statement to the detectives was inaccurate and that some portions of the interview were "a mistake." Kelli also submitted a statement at the preliminary

hearing that similarly contained some inconsistencies. Though Kelli's various accounts contained inconsistencies, all her recitations are consistent when it comes to the fact that Latu acted without her consent.

¶8 When Latu returned to the United States, he was arrested in Hawaii and extradited to Utah. Once in Utah, Latu met with detectives for a recorded interview. In that interview, Latu relayed his version of events. According to Latu, on that third occasion he and Kelli started kissing, Kelli lay down on her couch, and he pulled down her underwear. He remembered that when he pulled Kelli's underwear down, she held them up and said "no." Latu admitted that he heard Kelli say "no." Latu claimed it was hard to understand Kelli's meaning, and he admitted that he pulled harder and forced them down. Latu admitted that he performed oral sex on Kelli. He indicated that he put his penis outside Kelli's vagina and ejaculated but denied that there was ever any penetration. In fact, Latu explained that he had difficulty maintaining an erection. Latu admitted that he acted without Kelli's consent, and he did not stop.

¶9 At trial, the State presented evidence from Kelli, her ex-husband, Detective, and a forensic expert. Kelli testified to her version of the events as described above. Kelli's ex-husband testified about how Kelli told him that "she had been raped."

¶10 Detective testified about his interview with Latu, and the entire video of that recorded interview was played for the jury. On cross-examination, Detective admitted that there were some inconsistencies between Kelli's original statement and her testimony at trial.

¶11 On redirect, the State asked Detective how common it is in these kinds of cases "for the surrounding details to be sometimes inconsistent or sometimes different from account to account." Defense counsel (Counsel) did not object to this question. Detective responded,

> In my experience, it's very common for people who have experienced a sexual assault to—it's a very traumatic experience. They tend to remember the [incident] itself very clearly. And sometimes people will focus on very specific things during those—during that experience, kind of to the exclusion of a lot of other things. A lot of the time, when they come to speak to us about this kind of experience, they just want to talk about that experience. They're not very clear about the things leading up to or immediately after that experience.

¶12 After the close of evidence, at Latu's request, the district court instructed the jury on a lesser included offense to rape: forcible sexual abuse. The jury found Latu guilty of forcible sexual abuse.

## ISSUE AND STANDARD OF REVIEW

¶13 Latu appeals, arguing that he "received ineffective assistance of counsel when his attorney did not object to improper expert testimony from Detective." "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Perkins*, 2024 UT App 101, ¶ 11, 554 P.3d 363 (cleaned up).

## ANALYSIS

¶14 To establish an ineffective assistance of counsel claim, a defendant must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient . . . . Second, the defendant must show that the deficient performance prejudiced

the defense." *Id.* at 687. Because a "failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Latu's] claims under either prong." *See State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (cleaned up). The prejudice prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Gonzalez*, 2021 UT App 135, ¶ 8, 501 P.3d 1205 (cleaned up). "That is, the defendant's showing must undermine our confidence in the outcome." *Id.* (cleaned up). Here, Latu's claim clearly fails under the prejudice prong, so we need not address the issue of deficient performance.

¶15    Latu claims that he "received ineffective assistance of counsel when his attorney did not object to improper expert testimony from Detective." He asserts that "Detective was not qualified to opine on the effects of trauma on memory. Instead, he offered improper anecdotal evidence that was unsupported by reliable methods. This unqualified testimony improperly bolstered Kelli's credibility in a case that hinged on her credibility. Objectively reasonable counsel would have objected to the testimony."

¶16    Latu's argument cannot satisfy the prejudice prong of an ineffective assistance of counsel claim for at least two reasons. First, the jury already believed Latu over Kelli when it came to the most important issue in the case—whether a rape occurred. And second, the jury likely convicted Latu of forcible sexual abuse based on his confession alone.

¶17    The primary difference between Latu's and Kelli's accounts of their third meeting is that Kelli insists there was vaginal penetration and Latu insists there was not. Similarly, the primary difference between rape, the original crime for which Latu was charged, and forcible sexual abuse, the lesser included offense for which he was convicted, is that rape requires vaginal

penetration while forcible sexual abuse does not. *Compare* Utah Code § 76-5-402(2)(a) ("An actor commits rape if the actor has sexual intercourse with another individual without the individual's consent."), *with id.* § 76-5-404(2)(a)(i)(A) ("[A]n actor commits forcible sexual abuse if . . . without the consent of the individual, the actor . . . touches the anus, buttocks, pubic area, or any part of the genitals of another individual . . . ."). Here, the jury's verdict demonstrates it was persuaded by Latu's argument that Kelli was an unreliable witness because it found Latu was not guilty of rape but was guilty instead of forcible sexual abuse.

¶18　Latu's argument is that Counsel should have made an objection and attempted to exclude testimony aimed at bolstering Kelli's credibility. But Latu cannot prove prejudice on this point because it's clear that the State's efforts to rehabilitate Kelli's credibility (through Detective's testimony) were unsuccessful.

¶19　The district court even noted at the sentencing hearing, "The jury did not find [Latu] guilty of rape, which was the [principal] charge in the case." It continued that "one possible explanation for the verdict is that [the jury] had doubts about the credibility of some of [Kelli's] testimony because of some inconsistencies that were apparent in her interview with police." The court surmised that the jury's verdict could be explained by the fact that Counsel had discredited Kelli and the jury did not give her testimony much weight, despite the State's efforts to explain away any inconsistencies.

¶20　Even though the verdict makes clear that members of the jury questioned Kelli's credibility, Latu maintains that if Counsel had succeeded in excluding Detective's testimony, the result of the proceeding would have been different. This argument is unpersuasive. Latu had already obtained the best possible outcome in light of his confession, and the result could not be anything better than what it was here. In fact, Latu made a strategic decision when he asked the court to instruct the jury on

the lesser included offense of forcible sexual abuse. Latu could have gone forward without seeking this instruction in the hope that the jury would have acquitted him altogether. But Latu chose to introduce the idea of forcible sexual abuse, a decision that paid off when the jury acquitted on the rape charge. This decision, which Latu does not attack on appeal, constitutes a material part of the context in which we conclude that a better result could not be obtained.

¶21    "To evaluate prejudice under *Strickland*, we assess counterfactual scenarios—that is, what would have happened but for the ineffective assistance. The counterfactual analysis requires us to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Garcia-Flores*, 2021 UT App 97, ¶ 27, 497 P.3d 847 (cleaned up). If we imagine a world where Counsel successfully objected to Detective's testimony, even if we imagine a world without Kelli's testimony altogether, there is no reasonable probability that the result of the proceeding would have been different; no matter how much Latu discredits Kelli's testimony, the jury would have reached the same conclusion because Latu confessed to forcible sexual abuse.

¶22    It is especially difficult to demonstrate prejudice in cases where the defendant has confessed. After all, where there is unusually strong evidence to support the conviction, it does not matter whether some duplicative evidence was admitted or excluded. *See, e.g., id.* ¶¶ 1, 26–28, (holding there was no prejudice in a child pornography case in which the defendant confessed to possessing child pornography); *State v. Russell*, 2000 UT App 296U, para. 2 (holding there was no reasonable probability of a different result in that case because the defendant confessed to the crime).

¶23    Under Utah law, a person "commits forcible sexual abuse if . . . without the consent of the individual, the actor . . . touches . . . any part of the genitals of another individual" and

that person "intends to . . . arouse or gratify the sexual desire of any individual." Utah Code § 76-5-404(2)(a). At Latu's request, the jury was instructed on forcible sexual abuse. The instructions detailed each element of the offense, including the requirements that Latu "intentionally, knowingly, *or recklessly*" touched Kelli's anus, buttocks, genitals, or breast; "did so without [Kelli's] consent;" and "acted with intent, knowledge, *or recklessness* that [Kelli] did not consent." (Emphasis added.) *See id.* § 76-2-102 (requiring "intent, knowledge, or recklessness").

¶24   Here, in his police interview, Latu admitted that Kelli initially said "no" and fought him when he tried to pull her underwear down, that he had to act forcefully to remove her underwear, that he performed oral sex on Kelli, that he ejaculated on her, and that all of this was done without her consent. Based solely on the video of Latu's interview with the detectives, which was entered into evidence and played for the jury, the jury would have convicted Latu regardless of Kelli's testimony because he had confessed to the elements of forcible sexual abuse.

¶25   This is particularly the case considering that, under the relevant statute, Latu need only have been reckless when it came to whether Kelli consented. That is, the State would have only had to prove that Latu was "aware of but consciously disregard[ed] a substantial and unjustifiable risk that" Kelli did not consent to his actions. *See id.* § 76-2-103(3). Latu admitted that he heard Kelli say "no" but that he continued anyway and acted without her consent. Thus, based on Latu's interview alone, the State would have had no problem demonstrating that Latu possessed the requisite mental state to have committed forcible sexual abuse.

¶26   As the district court explained, even though Kelli's testimony was unreliable, the jury "felt comfortable finding [Latu] guilty based on what he admitted to police, which is that this was a non-consensual situation." The court went on, "[Kelli] said no and he proceeded anyway forcibly to remove her underwear and

engage in sexual contact with her when she was expressing desire that he not do so. So she said no and he continued. That was his own admission."

¶27 Because Latu's own testimony demonstrated that he acted without Kelli's consent—or was at least reckless as to her consent—there is no possibility of a better outcome for Latu, and he therefore cannot show prejudice.

CONCLUSION

¶28 Latu's ineffective assistance of counsel claim fails because he cannot demonstrate that he was prejudiced by Counsel's actions. Counsel had already discredited Kelli, and the State's attempts to reverse that effect were unsuccessful. Accordingly, even if Counsel succeeded in excluding Detective's testimony, it would not have resulted in a better outcome for Latu because he had confessed to forcible sexual abuse. We affirm Latu's conviction.

——————