STATE of Utah, Plaintiff and Appellant,

v.

Gordon KAUFMAN, Defendant and Respondent.

No. 21059.

Supreme Court of Utah.

Feb. 20, 1987.

---

**466**

David L. Wilkinson, Atty. Gen., Salt Lake City, Les Daroczi, Co. Atty., Ogden, for plaintiff and appellant.

Ronald Perkins, Ogden, for defendant and respondent.

HALL, Chief Justice:

Defendant was charged with two counts of receiving stolen property.[1] The trial court concluded that the conduct of the

police constituted entrapment as a matter of law and dismissed the two counts. The State appeals.[2]

The trial court conducted an evidentiary hearing on the issue of entrapment at which defendant and an undercover police officer testified.[3] In addition, recorded conversations between defendant and the undercover officer were transcribed and admitted into evidence.

The facts are not materially in dispute. Defendant and his wife owned and operated a jewelry store in Ogden, Utah. As part of their business, they bought and sold jewelry pawned by their customers. During the months of March, April, and May 1985, Bonnie King, a reserve Ogden City police officer, visited defendant's jewelry store as part of an undercover "sting" operation conducted by the Ogden Police Department.

On the first three occasions after the undercover operation began, King sold jewelry to defendant which was provided to her by the Ogden Police Department. Each time, she represented that the jewelry she sold was her own and not stolen. On each occasion, she also signed a pawn ticket which defendant prepared without requiring proof of identification as set forth in U.C.A., 1953, § 76–6–408(2)(d) (Repl.Vol. 8B, 1978 ed., Supp.1986). During these visits, King did not volunteer much information, but readily answered all of defendant's questions. Defendant was talkative, so there was an extensive interchange.

The sting operation required King to assume the identity of Nora Reuter—a divorced woman supporting six children between the ages of four and nineteen. The children's father provided little support, and things were economically "tight." As a source of income, Nora tutored children in math and gave piano lessons. She also

1. U.C.A., 1953, § 76–6–408 (Repl.Vol. 8B, 1978 ed., Supp.1986). Defendant was also charged with the offense of racketeering in violation of U.C.A., 1953, § 76–10–1603 (Repl.Vol. 8B, 1978 ed., Supp.1986). That count was dismissed at the preliminary hearing.

2. U.C.A., 1953, § 76–2–303(5) (Repl.Vol. 8B, 1978 ed.) provides: "Should the court determine that the defendant was entrapped, it shall dis-

miss the case with prejudice.... Any order by the court dismissing a case based on entrapment shall be appealable by the state."

3. U.C.A., 1953, § 76–2–303(4) (Repl.Vol. 8B, 1978 ed.) provides: "Upon written motion of the defendant, the court shall hear evidence on the issue and shall determine as a matter of fact and law whether the defendant was entrapped to commit the offense...."

indicated she was forced into the situation of selling her jewelry.

Nora represented herself to be forty-three years old, five feet three inches tall, weighing one hundred ten pounds. Both defendant and his wife noted that she looked much younger—perhaps thirty-five years old. And defendant jokingly suggested loaning Nora $5,000 based on her good looks alone.

On April 4, 1985, Nora phoned defendant for an appointment. Defendant suggested meeting at Nora's house. Nora declined, saying she wanted to stay on neutral ground. Defendant made overtones for a more intimate relationship. Nora again declined and insisted the meeting be at a restaurant or at defendant's place of business.

On April 5, 1985, Nora met defendant at his office as agreed. She informed him that the jewelry she had previously sold him was stolen property. She also stated that she wanted to continue selling him jewelry on a similar basis so long as they did not use the pawn tickets each time. Defendant told Nora he would not become implicated for only a $25 or $30 profit, but if he was going to get $500,000, he might "take a chance." Defendant was apprehensive and suggested that Nora might be setting him up. Nora then offered to buy the jewelry back if he was not comfortable with the situation. Defendant asked if she was really a teacher, if she really needed money, and if she was actually divorced and supporting six children. Nora insisted it was all true. Defendant indicated that he ran a very respectable business and was worried about getting involved.

Defendant did not report this incident to the police. Later, he was charged with count one, receiving stolen property on April 5, 1985, because he had possession of the jewelry sold to him on the three previous occasions.

Nora next contacted defendant on May 21, 1985. Defendant said he had been on a trip to Israel and had also been in the hospital. May 21st was his first day back to work. Later in the day, they met and talked. Defendant lamented because Nora had not visited him in the hospital and had given him the wrong phone number. He then offered to personally loan her some money. She declined, but she agreed to come in later.

On May 28, 1985, the undercover police officer again went to defendant's store with a sizable amount of jewelry and diamonds. During the course of this meeting, defendant indicated that he could not buy the jewelry that day as he had lost money in Wendover, Nevada, over the weekend. Defendant later testified that he could have gone to the bank for the money if he had really wanted to purchase Nora's jewelry that day, but that he stalled because he wanted to "check it out." Additionally, defendant testified that he was not interested in being involved in a large-scale heist operation and was going to call the police in Las Vegas to find out if there had been a jewelry heist there, but that he was arrested before the undercover police officer left the store that morning.

As for the jewelry and diamonds, the officer told defendant that she did not like "carrying the stuff around" and hoped to make the sale that day. In response, defendant told her that she could leave it in his safe for a couple of days, take it with her, or do whatever she wanted. The undercover officer elected to leave the jewelry with defendant.

Finally, defendant again offered Nora a personal loan of $100 after she indicated that she was hoping to sell the jewelry that day. Defendant talked about the $100 as a personal loan, while the officer wanted it applied toward the stolen jewelry. Defendant was then arrested and charged with count two, receiving stolen property on May 28, 1985.

■ In its written ruling, the trial court cited and appropriately relied upon this Court's decision in *State v. Taylor*[4] for the proposition that the objective standard

4. 599 P.2d 496 (Utah 1979).

is to be applied in making the determination of whether police conduct entrapped a defendant.[5] In reaching its conclusion, the trial court also appropriately relied upon the decision of this Court in *State v. Cripps,*[6] wherein we stated that the particular circumstances of each defendant should be considered in relation to the police conduct.[7]

 In light of the facts and circumstances of this case, the trial court concluded that the undercover police officer was not just selling stolen merchandise, but was selling herself as an attractive, relatively young, divorced mother of six children who was having hard times. As the court stated:

> Clearly, the defendant saw more in her than a business relationship. Why didn't the police send in a male officer? Or an unattractive female police officer? The answer is clear from the relationship which developed. Nora first became a friend to the defendant so that it was hard for the defendant to call the police and turn her in. He suggested the relationship become more intimate.

This Court does not view the facts differently, nor does it draw different conclusions therefrom. Application of the objective standard espoused in *Taylor* prompts the conclusion, as a matter of law, that the offenses committed were not the product of defendant's initiative or desire, but were induced by the conduct of the undercover officer. In *Taylor,* and also in *State v. Sprague*[8] and *State v. Kourbelas,*[9] on facts markedly similar to those in this case, the Court reached the same conclusion.

The judgment of the trial court is affirmed.

HOWE, DURHAM and ZIMMERMAN, JJ., concur.

STEWART, Associate C.J., concurs in the result.

---

5. *Id.* at 503. U.C.A., 1953, § 76–2–303(1) (Repl. Vol. 8B, 1978 ed.), defines entrapment as follows:

> [E]ntrapment occurs when a law enforcement officer or a person directed by or acting in co-operation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

