**2025 UT App 178**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
QASIM ABDUL QAYUM,
Appellant.

Opinion
No. 20240207-CA
Filed December 11, 2025

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 191904728

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Emily Sopp,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1     Qasim Abdul Qayum began chatting on a dating app with a person who told Qayum that she was a thirteen-year-old girl. The two planned to meet to have sex, but the person turned out to be an undercover police officer, and Qayum was arrested when he arrived at the meet-up location. A jury later convicted Qayum of enticing a minor. Qayum now challenges his conviction, arguing that his counsel rendered constitutionally ineffective assistance and that the district court erred in denying two motions to dismiss the case and one motion to suppress evidence. We reject Qayum's arguments and affirm his conviction.

BACKGROUND[1]

¶2    In February 2019, while conducting an internet sting operation, an undercover police officer (Agent) created a profile for a persona named "Mae" on an online dating app. Agent listed "18" as Mae's age on the profile, and for Mae's photos, Agent contacted a modeling agency and asked for pictures of an adult female model who "look[ed] really young." A model (Model) took photos of herself and provided them to Agent, who then used them for Mae's profile and app messages.

¶3    Mae's profile caught Qayum's attention. Qayum first messaged Mae using the app, leading to the following exchange, which took place over the course of a few days:

> Qayum: Wyd[2] beautiful
>
> Qayum: Wanna make [moneybags emojis]
>
> Mae: How so
>
> Qayum: You would have to do something would you do that?
>
> Mae: Maybe what did u have in mind
>
> Qayum: Cuddling, making out, maybe sex
>
> Mae: Yea
>
> Mae: I'm down
>
> Qayum: When are you free?

---

1. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up).

2 "Wyd" is a vernacular abbreviation for "What are you doing?" *See Garcia v. State*, No. 05-22-00526-CR, 2023 WL 4731296, at \*7 (Tex. App. July 25, 2023).

¶4     About a week later, Mae resumed the conversation, and she and Qayum discussed the amount of money Qayum would pay. She initially asked for $500; Qayum countered with $400 and asked if that was "ok," which triggered the following exchange:

> Mae: Yea you ok if I'm younger
>
> Qayum: If you're 18 I won't have a problem
>
> Qayum: How old are you?
>
> Mae: Well…….
>
> Mae: I'm not
>
> Qayum: Well how old are you [right now]?
>
> Mae: 13
>
> Qayum: Oh dam you're very young we can do it but we have to be very careful.

¶5     The conversation continued. Qayum asked Mae to send photos, and she sent various photos of herself wearing clothes. After that, the conversation turned sexual in nature. Qayum asked Mae if she had "ever done it before," meaning "[m]aking out, cuddling, sex." Mae replied, "Yea . . . [a] couple times." At one point in the conversation, Mae told Qayum that if she got pregnant, her "dad would kill [her]." Qayum replied, "No worries I'll pull it out at the end."

¶6     The two then planned to meet at a hotel. Qayum told Mae to bring a swimsuit and to "dress up [and] look sexy." Qayum—who apparently liked the fact that the profile picture showed that Mae had long hair—asked Mae multiple times for more photos of her "long hair above the booty." When she sent them, he replied, "Omg I have lost my consciousness you're so hot and sexyyyy, your long hair and ass on fire [fire emoji] can't wait to meet this gorgeous girl [heart emojis]." During the week before the planned meetup, Qayum asked Mae if she was "ready" and if she had "ever met a guy who [was] over 18." Mae told him that she had.

¶7 On the day of the meet-up, Qayum asked if they could meet at Mae's apartment instead of a hotel, and Mae agreed. Qayum asked if Mae would "be home alone." Mae responded, "Yea I'm going to leave after this class," which she later clarified was "[PE] and math." Qayum asked for the address of Mae's apartment complex, and she provided an address. Mae then asked Qayum to bring her a burger from a specific fast-food restaurant, and Qayum said he would do so. A few minutes later, Qayum messaged Mae that he was close to her apartment and asked her to "[d]elete all of [his] old messages." He said he would do the same because "[i]t's safe for [them]."

¶8 Qayum arrived at the apartment complex with $140 cash and a bag containing food from the specified fast-food restaurant. Officers arrested him and transported him to the police station.

¶9 At the station, an officer (Officer) informed Qayum of his *Miranda* rights and ended the recitation by asking, "Do you understand everything?" Qayum nodded. Officer then asked, "Can you tell me so?," and Qayum replied, "I have to tell my attorney to talk to you . . . to answer my questions."[3] Officer said, "So, you understand all that?," and Qayum answered, "Yeah."

¶10 Officer then proceeded to question Qayum, and she asked, "So, why do you think we're here today?" Qayum answered that

---

3. There are several renditions of this sentence in the record, some with subtle differences. In some parts of his briefing, Qayum describes the quotation in question as including the word "wait" at the beginning of the sentence. However, after an evidentiary hearing on Qayum's motion to suppress, the district court phrased the quote as follows: "I have to tell my attorney to talk to you . . . to answer my questions." Based on our own review of the video recording of Qayum's interview, which is also part of the record submitted to us, this is a fair interpretation of what Qayum said. The word "wait" is neither in the transcript nor in the district court's findings, nor is it apparent to us from our own review of the video that Qayum used this word when he made the statement quoted above.

he had "made a mistake," that he "[j]ust lost [his] conscience," and that he had done "something stupid." Officer told Qayum that Mae's "parents found her phone" and got the police involved. Qayum explained that he met Mae on a dating app and that her age showed "18." Officer then asked if he and Mae had "talk[ed] about how old she was" during their conversation, and Qayum answered, "She was 13 . . . . I was shocked." Qayum admitted that when he found out that Mae was thirteen, he told her that they had to be "careful." And Qayum admitted that he talked about having sex with Mae and offered to pay her $400. Qayum also stated, "[Mae] was expecting to have sex, so I was—that's what I was expecting, to have sex, but I would've—I just came to hang out with her."[4] By the end of the interview, he admitted that if Mae had wanted to have sex, it "[c]ould have happened." Officer asked Qayum if he wanted to write a letter "to [Mae] and her family," and he agreed to do so. In that note, Qayum wrote that he was "really sorry" and that he could "understand the pain and feeling that [the parents] have for [their] daughter."

¶11    Later, the State charged Qayum with one count of enticing a minor, a second-degree felony.

¶12    During discovery, Qayum requested, among other things, a "full and complete digital copy" of Mae's online profile, including "any photos, images, text, or other information contained in" that profile. Qayum also requested "copies of any and all photos . . . posted, sent, or otherwise communicated or used in connection with" Mae's profile in Qayum's case. Qayum further requested the identity and contact information of Model, the individual depicted in the photographs.

¶13    The State provided Qayum with screenshots of the chat conversation between Qayum and Mae and a screen recording of

---

4. The version of this sentence we quote here is slightly different from the version contained in the written transcript of the interview. Our review of the video recording of the interview reveals that the sentence as we quote it here is a more accurate representation of what Qayum said.

the same, but the State did not provide a digital copy of the profile with the metadata. The State responded that a "screen shot of" Mae's profile did "not exist," that there "was one photo" of Model "in a white t-shirt," and that no other photos were placed on Mae's profile. The State also responded to the request for photos, as follows: "The photos are [e]mbedded in the video of the undercover chat. The pictures used by [Agent] are the only copies available. The metadata associated with the photos are deleted to protect [Model] and the origination of the photo when used in the undercover chats." Regarding the request for Model's contact information, the State responded that it would not provide that information because it considered Model to be "a protected confidential informant."

¶14 Before trial, Qayum filed three motions to dismiss. First, after the State designated Model as a confidential informant pursuant to rule 505 of the Utah Rules of Evidence and refused to disclose Model's identity or contact information, Qayum moved to dismiss the case, asserting that Model's testimony was needed to discern her "true age," to determine "when and where the photographs were taken," to reveal the "instructions" the police gave her, as well as to authenticate the photos, among other things. The district court denied the motion and ruled that "there [was] no reasonable probability that [Model] [could] give testimony necessary to a fair determination" of Qayum's guilt or innocence. The court found that Model's testimony was not relevant to Qayum's mental state nor was it relevant to his entrapment defense. The court explained that "[t]he true age of [Model] or how the photograph was made . . . are irrelevant to [Qayum's] actual belief as to the age of the person" he was communicating with.

¶15 Second, Qayum moved to dismiss the case under *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, claiming that the State had destroyed exculpatory evidence when it failed to preserve the entirety of Mae's online profile, including the full-size versions of the profile photo and other photos sent in the chat, as well as the chat metadata. At the hearing on this motion, the court asked whether it was "speculative" what the "supposed evidence

included and how it might possibly have been exculpatory." Qayum responded that a "photograph of an adult . . . would lead an ordinary person to believe that they were communicating with an adult," that a "representation that the person is over the age of 18 would lead an ordinary person to believe they were communicating with someone over the age of 18," and that, together, "[t]hose two facts are exculpatory." The State conceded that it did not have the original full-size photos but explained that some of the photos, including the profile photo, could be seen in thumbnail size in the screen recording of the chat. And the State also conceded that "for all photos that were sent, the person photographed was at least 18 years of age."

¶16　In an oral ruling, the court denied Qayum's *Tiedemann* motion. The court found that "[t]he State did preserve and ha[d] produced a video screen grab or recording of the communications between [Qayum] and [Agent], and with respect to the profile, the State [did] not dispute that the woman in the profile photograph was over 18." The court also determined that, "given the other evidence that exists, including the video of the chats and [Qayum's] interview with law enforcement, the argument that the actual profile or a forensic copy of the communications with metadata is exculpatory is little more than speculation," and the court indicated that it was "not persuaded that the absence of this evidence would undermine confidence in the outcome of any trial in this case." The court offered its view that the profile photo was reproduced in the video and that the chat "include[d] at least some date and time stamps." Thus, the court concluded that Qayum had "failed to demonstrate a reasonable probability that the lost evidence . . . would have been exculpatory."

¶17　Qayum's third motion to dismiss was short-lived. In that motion, he argued that the case should be dismissed because, in his view, the State had entrapped him as a matter of law. At the hearing on this motion, Qayum argued that he had been entrapped because he messaged a person who he thought was an adult, on an adult dating app, and that his offer of sex was made to an assumed adult, before Mae had indicated that she was thirteen. Qayum requested an evidentiary hearing to question

Agent about the chat transcript, ask whether Agent or Qayum had reengaged communication in the chat after their initial exchange, and ask if any messages were missing from the transcript. The court explained that it was "very skeptical that, under any circumstances, . . . reengagement could amount to entrapment justifying dismissal." But the court nevertheless scheduled the requested evidentiary hearing. Qayum's attorney (Counsel) asked for time to discuss the court's ruling with Qayum and decide what "direction" to go from there. Counsel later emailed the court asking it to "strike the evidentiary hearing" because "there [was] not a need for the court to hear evidence of entrapment." And Counsel did not renew a motion to dismiss the case based on entrapment as a matter of law. At trial, however, Counsel argued to the jury that Qayum had been entrapped, and the jury was given an instruction on entrapment.

¶18    In addition to his three motions to dismiss, Qayum filed a motion to suppress the statements he made during his police-station interview, arguing that Officer had violated his *Miranda* rights by allowing the interview to proceed after Qayum invoked the right to counsel. Qayum centered his argument on his statement, "I have to tell my attorney to talk to you . . . to answer my questions." Qayum claimed that this statement constituted an invocation of his right to counsel, and he asserted that Officer ignored this invocation. The court held an evidentiary hearing, and the State presented a video recording of Qayum's interview wherein Qayum could be seen nodding along as he was given his *Miranda* rights, as well as his affirmative answer that he understood his rights. Agent, who was in the room with Qayum as he was interviewed, testified that Qayum had been "advised of *Miranda*" before he was asked any questions. Agent explained that after Qayum was read his rights, Officer asked Qayum to "explain his rights back" to Officer "to make sure that he understood" them, and that Qayum "seemed very understanding of his rights." Agent also testified that although he "could tell that English was not [Qayum's] first language," "all of [their] conversation was done in English, and it appeared as though [Qayum] was understanding exactly what [Agent] was saying."

¶19    At oral argument on the motion to suppress, Qayum also argued that the State never obtained a valid waiver of Qayum's right against self-incrimination. Counsel explained, "We have to look first to whether there is a valid waiver. I don't see anything in the record that can be construed as a waiver of those rights." And later, Counsel argued that Officer "never [got] the waiver" and that it was "the police['s] responsibility to provide [the *Miranda*] warnings and then to obtain a valid waiver of the rights before proceeding with the interrogation."

¶20    The district court denied the motion to suppress and found that, "in context and based on [Agent's] testimony," Qayum's "statement about telling his attorney to talk to them was confirming to [Officer] that he understood that he has a right to [an] attorney who can answer any questions he may have." The court found that Qayum's statement "certainly was not an unequivocal invocation of his right to counsel." The court also found that Qayum "never expressed confusion about his *Miranda* rights, never asked any questions about those rights, and never asked for a break or for time to think" about those rights. "Instead," the court explained, Qayum "indicated that he understood the rights and then proceeded to answer [Officer's] questions." Thus, the court concluded, "[b]y failing to invoke his rights unambiguously and by proceeding to answer [Officer's] questions without hesitation, [Qayum] did not invoke his right to counsel, [Officer was] permitted to proceed with . . . questioning, and there is no basis on which to suppress [Qayum's] statements."

¶21    Eventually, the case proceeded to trial. In support of its case, the State called Agent and Officer as witnesses, and they testified as to the events described above. The State also presented, among other things, the screen recording and screenshots of the chat conversation between Qayum and Mae. And the State played for the jury video excerpts from Qayum's police-station interview.

¶22    During Agent's testimony, he explained that when texting with Qayum, he intentionally worked into the conversation statements about "school," "boys," and Mae's dad potentially

"kill[ing]" her if she got pregnant, and that he did so to make clear to Qayum that he was chatting with a minor and to eliminate any "confusion" about her age. Agent also testified that he gave Qayum multiple "opportunit[ies]" to back out of the endeavor.

¶23   After the State rested, Counsel moved for a directed verdict "on the grounds that [the State had] not met all the elements" and had not "put on sufficient evidence" that Qayum believed that Mae was a minor. The court denied the motion and found there was "sufficient circumstantial evidence from which a reasonable person could infer that [Qayum] believed that the person he was talking with was a young girl."

¶24   Qayum did not call witnesses of his own, and he did not testify in his own defense. In closing argument, Counsel argued that Qayum had been entrapped and was "not ready to commit the offense" without police encouragement. Counsel also argued that the State had not met its burden to obtain a conviction because Qayum did not believe that the person he was chatting with was actually a minor.

¶25   After deliberation, the jury convicted Qayum of enticing a minor. Later, the court sentenced Qayum to prison, but it suspended that sentence and placed Qayum on probation, with conditions, including a jail term.

ISSUES AND STANDARDS OF REVIEW

¶26   Qayum now appeals his conviction, and he presents four issues for our review. First, he argues that Counsel rendered constitutionally ineffective assistance by not renewing the motion to dismiss (or by not moving for a directed verdict) regarding entrapment. Relatedly, he also argues that the district court plainly erred by not dismissing the case on the basis of entrapment as a matter of law. Both ineffective assistance and plain error claims present issues that we decide in the first instance, as a matter of law. *See State v. Dew*, 2025 UT App 22, ¶ 28, 566 P.3d 53, *cert. denied*, 568 P.3d 264 (Utah 2025).

¶27　Second, Qayum challenges the district court's order denying his *Tiedemann* motion to dismiss. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (cleaned up).

¶28　Third, Qayum challenges the district court's order denying his motion to dismiss regarding the informant privilege set forth in rule 505 of the Utah Rules of Evidence. "We must decide whether the district court applied the correct legal standard when it found that rule 505 did not require it to dismiss the charges against [the defendant]. We review the district court's decision de novo, according no deference to its legal determination." *Nielsen v. State*, 2016 UT 52, ¶ 9, 391 P.3d 166 (cleaned up).

¶29　Finally, Qayum challenges the district court's order denying his motion to suppress the statements he made in his police-station interview. "We review a district court's ruling on a motion to suppress for correctness, and we review its factual findings in support of its ruling for clear error." *State v. Garcia-Flores*, 2021 UT App 97, ¶ 10, 497 P.3d 847 (cleaned up). In particular, where, as here, a district court "bases its ultimate conclusions concerning the waiver of a defendant's *Miranda* rights upon essentially undisputed facts, in particular the transcript of an officer's colloquy with the defendant, its conclusions present questions of law which we review under a correction of error standard." *Id.* (cleaned up).

## ANALYSIS

### I. Entrapment as a Matter of Law

¶30　Qayum first asserts that Counsel rendered ineffective assistance by not again moving to dismiss, or for a directed verdict, on the entrapment issue. Alternatively, Qayum argues

that the district court plainly erred by not sua sponte dismissing the case on that basis. We disagree with Qayum's contentions.

¶31 "Entrapment occurs when a peace officer or a person directed by or acting in cooperation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it." Utah Code § 76-2-303(1). But "[c]onduct merely affording a person an opportunity to commit an offense does not constitute entrapment." *Id.* If a court concludes, as a matter of law, "that the defendant was entrapped, it shall dismiss the case with prejudice." *Id.* § 76-2-303(5).

¶32 Entrapment "is a highly fact-intensive" inquiry. *State v. Torres*, 2000 UT 100, ¶ 8, 16 P.3d 1242 (cleaned up). Indeed, "the transactions leading up to the offense, the interaction between the agent and the defendant, and the response to the inducements of the agent, are all to be considered in judging what the effect of the governmental agent's conduct would be on a normal person." *State v. Dickerson*, 2022 UT App 56, ¶ 36, 511 P.3d 1191 (cleaned up). "If there is a reasonable basis in the evidence upon which jurors could find beyond a reasonable doubt that the crime was a result of the defendant's own voluntary desire and intent to commit the crime, the defendant has not established entrapment as a matter of law." *Id.* ¶ 30 (cleaned up). "Only when reasonable minds could not differ can the court find entrapment as a matter of law." *Id.* ¶ 21 (cleaned up). "If reasonable minds could differ on whether or not entrapment occurred, the court must deny the motion and allow the issue of entrapment to go to the jury." *Id.* (cleaned up).

¶33 Against this backdrop, we must assess whether Counsel provided ineffective assistance by opting not to either renew the motion to dismiss or move for a directed verdict based on entrapment as a matter of law. Under the test established by *Strickland v. Washington*, Qayum must make a two-part showing: (1) that Counsel's performance "fell below an objective standard of reasonableness" and (2) that this deficient performance

"prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either [component] is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶34    Here, we cannot fault Counsel for not re-raising the issue of entrapment as a matter of law because any motion along those lines would have been futile on the facts of this case.

¶35    We have generally found entrapment as a matter of law in "two types of cases." *Dickerson*, 2022 UT App 56, ¶ 37. The first involves "improper police conduct in which the government agent applied persistent pressure or persistently pursued the defendant to commit the crime." *Id.* (cleaned up). The second involves "appeals based on sympathy, pity, or close personal friendships, or offers of inordinate sums of money." *Id.* (cleaned up). None of these specific methods were employed by the State here, and regardless of whether Agent's actions fit into either of these two categories of cases, his actions did not constitute entrapment as a matter of law.[5]

¶36    Qayum was not subjected to persistent pressure or requests, and Agent did not harass Qayum. Nor did Agent

_____

5. Qayum correctly points out that these categories of entrapment cases are not exhaustive and that it is possible for entrapment to "occur in a situation outside" of the two recognized categories. *State v. Smith*, 2024 UT 13, ¶ 38 n.63, 548 P.3d 874. But regardless of whether Agent's actions fall within or outside of the two recognized categories, his actions did not constitute entrapment as a matter of law on the facts of this case. *See infra* ¶¶ 40–42.

develop a personal relationship with Qayum that Agent then exploited. Instead, after Qayum contacted the Mae persona, Agent gave Qayum a clear opportunity to disengage by telling Qayum that "she"—Mae—was thirteen years old *and* by following that statement with various indications that Mae was still in school and living at home with her father. Agent testified that he included statements about "school," and "boys," and her dad "kill[ing]" her if she got pregnant to convey to Qayum that he was chatting with a minor, so that there would be no "confusion" about her age. Agent further testified that these statements gave Qayum the "opportunity" to back out. But Qayum did not take the opportunity: his response to Mae's claim that she was thirteen was that they needed to be "careful," and his response to Mae's fear that her dad would "kill" her if she got "pregnant" was that he would "pull it out at the end." He also told her to delete their text messages from her phone.

¶37　Agent's actions are similar to those of the special agent in *Dickerson*, where we reversed the district court's conclusion that the defendant had been entrapped as a matter of law. *See* 2022 UT App 56, ¶ 47. There, a special agent used "an online persona he had created to pose as a thirteen-year-old girl" with the age "eighteen" listed on the profile and an unaltered "closeup, selfie-type picture" of a female police officer "who was in her twenties" for the profile photo. *Id.* ¶¶ 2–3. The defendant made first contact, and shortly after, "Kailey" told the defendant that she was in middle school and thirteen years old. *Id.* ¶ 4. Undeterred, the defendant continued the conversation, which became sexual in nature, and the defendant assured Kailey that if they engaged in sexual activity, he would wear a condom and she would not become pregnant. *Id.* ¶¶ 4–7. The two arranged to meet, and upon arrival at the predetermined location, the defendant was apprehended by law enforcement and later charged with enticing a minor, among other charges. *Id.* ¶¶ 8–10.

¶38　The defendant moved to dismiss, arguing that he was entrapped as a matter of law, and the district court agreed. *Id.* ¶¶ 10–11. The court centered its ruling on "the compounding impact of three decisions" by the special agent: "adult-certify[ing]

Kailey on the dating app," "post[ing] a picture of an adult woman on Kailey's dating app profile," and "direct[ing] the text messaging toward overtly sexual topics." *Id.* ¶ 12 (cleaned up). The court found it "significant that the agent certified that his online persona was 18 years of age or older and posted the picture of an adult woman on the profile, [who] . . . appeared to be at least 18 years of age, if not older." *Id.* ¶ 49 (cleaned up). Given these facts, the court concluded that a "reasonable person in [the defendant's] circumstances could justifiably conclude that he was chatting not with a child but with an adult woman who was pretending to be a minor and a sexual innocent." *Id.* (cleaned up).

¶39    We reversed. *Id.* ¶ 58. Among other reasons for rejecting the defendant's argument, we concluded that "the fact that the agent initially presented the undercover persona as an adult does not establish entrapment as a matter of law." *Id.* ¶ 51. We focused on the text conversation and explained that when Kailey told the defendant that she was in middle school and thirteen years old, the defendant asked, "[Why] it say 18 baby," to which Kailey replied, "I'm serious. I'm 13." *Id.* In light of this exchange, we held that a "jury could find that a person not otherwise ready to commit the crime would have immediately terminated the conversation." *Id.* (cleaned up). Yet the defendant continued the conversation and planned to meet with Kailey to engage in sexual activity. *Id.* We held that "these facts are not sure to leave *all* reasonable minds reasonably doubting whether the commission of the offense was the product of [the defendant's] inclination." *Id.* (cleaned up).

¶40    The same analysis applies here. Qayum had the opportunity to immediately terminate the conversation when Mae said she was thirteen—despite the profile including a photo of an adult and a listed age of eighteen. Undeterred by Mae's age and her references to middle school, Qayum continued the conversation and planned to meet up for sex. These facts do not "leave *all* reasonable minds reasonably doubting whether the commission of the offense was the product of [Qayum's] inclination." *Id.* (cleaned up).

¶41 Qayum attempts to distinguish his case from *Dickerson*, arguing that Agent "[c]apitaliz[ed] on Qayum's attraction to an adult model" as a way of taking advantage of Qayum before revealing that Mae was only thirteen. And further, Qayum observes that he "had already solicited Mae to engage in sex before Mae claimed to be" thirteen, and he argues therefrom that this pre-existing agreement added pressure on Qayum to follow through with the meet-up.

¶42 But the problem here is that Qayum continued to try to have sex with Mae even *after* he learned that she was thirteen. At that moment, an average law-abiding citizen would have discontinued the conversation. *See id.* ¶ 22 ("The test is whether a law enforcement official . . . induced the defendant to commit such an offense by persuasion or inducement which would be effective to persuade an average person." (cleaned up)). And this is true despite Model's alleged attractiveness and despite any pressure attributable to the pre-age-reveal agreement to have sex.[6] Mae's revelation that she was only thirteen years old provided a clear line of demarcation, and it was an obvious opportunity for Qayum to withdraw from the conversation. Yet he continued the conversation, asked for more photos, planned to meet up to have sex, and traveled to the location where they were to meet—all

_____

6. We are entirely unpersuaded by Qayum's argument that Model's asserted extreme attractiveness induced Qayum to commit a crime he wasn't otherwise ready to commit. We agree with the State that any discussion in Utah caselaw about the use of an attractive agent being a factor that could contribute to an entrapment finding has been limited to *non-sexual crimes*, *see, e.g.*, *State v. Kaufman*, 734 P.2d 465, 467–68 (Utah 1987), and that as regards *sexual crimes*, the attractiveness of the putative victim should not be viewed as a material factor in an entrapment analysis. After all, in sex-crime cases, sexual attraction is not an unusual or extraordinary motive; rather, a defendant's attraction to the putative victim is a baseline feature of almost every case and is thus best viewed as simply a part of any normal opportunity to commit the offense.

while making statements that a reasonable jury could conclude demonstrated that he believed Mae was a minor. And, as discussed below, *see infra* Part III, Qayum admitted during the police interview that he thought Mae was thirteen. At the very least, a jury could have reasonably found that Qayum's continued engagement and attempted meet-up with Mae after she had told him she was thirteen was the "result of [his] own voluntary desire and intent to commit the crime." *Id.* ¶ 30 (cleaned up); *see also State v. Salmon*, 612 P.2d 366, 369 (Utah 1980) ("When there is a reasonable basis in the evidence upon which jurors could believe beyond a reasonable doubt that the crime was a result of a defendant's own voluntary desire and intent to commit the crime, the fact that a police officer merely afforded him the opportunity to commit it, does not amount to entrapment.").

¶43 Under these circumstances, renewal of the motion to dismiss (or moving for a directed verdict) arguing entrapment as a matter of law would have been futile, and on that basis we are simply unable to conclude that Counsel's performance was deficient. *See State v. Carter*, 2022 UT App 9, ¶ 30, 504 P.3d 179 ("A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome." (cleaned up)), *aff'd*, 2023 UT 18, 535 P.3d 819. On this basis, we reject Qayum's claim that Counsel rendered constitutionally ineffective assistance.

¶44 And for similar reasons, the district court did not commit plain error by opting not to sua sponte dismiss this case on entrapment grounds. To succeed on a plain error claim, Qayum must show that "(i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (cleaned up), *cert. denied*, 550 P.3d 994 (Utah 2024). Here, had the district court dismissed the case on entrapment grounds, that would have been erroneous and would have been grounds for reversal, just as in *Dickerson*. *See* 2022 UT

App 56, ¶ 58. The district court therefore did not commit error at all, let alone obvious error, by opting not to take that action; instead, it correctly determined that the entrapment issue was one properly reserved for the jury's consideration.

## II. The *Tiedemann* Motion to Dismiss

¶45    Next, Qayum argues that the district court erred when it denied his motion to dismiss the case as a sanction for the State's failure to preserve evidence.[7] We discern no error in that decision.

¶46    "It is a matter of clear Utah law that criminal defendants are entitled to information possessed by the State to aid in their defense." *State v. Tiedemann*, 2007 UT 49, ¶ 40, 162 P.3d 1106. Indeed, in some instances, "the destruction or loss of such evidence violates due process." *State v. Mohamud*, 2017 UT 23, ¶ 18, 395 P.3d 133. "[T]o establish a due process violation arising from the loss of evidence, a defendant must first demonstrate a reasonable probability that the lost evidence would have been exculpatory." *Id.* Once that threshold inquiry has been satisfied, a court must engage in "the second part of the *Tiedemann* analysis," in which it "must balance" "two factors" that assist it in determining the seriousness of the violation and the appropriate remedy: "(1) the culpability of the State in the loss or destruction

---

7. On this point, Qayum requests a remand, pursuant to rule 23B of the Utah Rules of Appellate Procedure, so that he might further develop record evidence supporting a claim that Counsel rendered ineffective assistance by failing "to explain that the State never produced an uncropped version of the profile photo." In its response to Qayum's motion for remand, the State agreed "that the only version of the [Mae] profile photo produced to the [district] court was a thumbnail of the original image" and that Counsel "made their objection to this thumbnail image clear to the [district] court." Given that the record apparently now contains all of the things Qayum wanted to develop on remand, no remand is necessary, and the rule 23B motion is therefore denied.

of the evidence and (2) the prejudice to the defendant as a result of the missing evidence." *Id.*

¶47 Regarding the threshold inquiry, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* ¶ 20 (cleaned up). "The bar is quite low and will be met so long as the defendant's proffer as to what the lost evidence would have shown is not pure speculation or wholly incredible." *Id.* (cleaned up). That said, "even though the bar is low, there must be more than speculation." *Id.*

¶48 In this case, the State provided screenshots and a screen recording of the entire chat to Qayum, including the various photos Mae sent through the chat. But the State deleted the profile itself and its associated metadata, as well as the full-resolution photo of Model that Agent posted as Mae's profile photo. Regarding that photo, Qayum received only a cropped and thumbnail-size version of it, which appeared in the chat conversation. From these facts, Qayum argues that "Mae's profile would have been exculpatory" because it "would have cast doubt on the State's evidence that Qayum believed Mae was a minor." And Qayum asserts that Model was an adult and did not appear to be thirteen years of age in the profile photo.

¶49 But this argument misses the mark for two related reasons. First, the State conceded that Model was over eighteen years old and that therefore Mae's profile photo depicted an adult woman. Moreover, the jury knew that the profile said "18" and that Model was an adult. It is therefore unclear whether the full-resolution photo would show anything more than what the State had already conceded and the jury knew: that the profile photo depicted an adult woman.

¶50 Second, and more importantly, even if the full-resolution photo depicted a woman who clearly *appeared* to be an adult, that would not change the fact that Qayum subjectively believed that Mae was a minor. *See* Utah Code § 76-4-401(2)(b)(i) (2018) (stating that, for an enticement crime, what matters is whether the defendant has contacted "a minor or a person *the* [*defendant*]

*believes to be a minor*" (emphasis added)).[8] As noted already, *see supra* ¶ 10, and as discussed more fully below in Part IV, during his police interview Qayum never claimed to believe that Mae was an adult; in fact, he admitted that he thought Mae was thirteen. And—importantly—he had seen the full-resolution profile photo. Here, the key problem is that Qayum has provided no evidence—in the form of an affidavit, for example—indicating what the full-resolution photo would have shown or that the contents of that photo would have been likely to convince him that Mae—despite her statements to the contrary—was an adult. And any such evidence would be in direct tension with Qayum's own experience—after all, *he* saw the full photo and still apparently came to believe Mae was thirteen.

¶51   In other words, while it may have been possible for Qayum to have met his burden of demonstrating a reasonable probability that the photo was exculpatory—by, for instance, submitting his own affidavit averring that the photo contained a clearly aged woman and that, because he saw the full photo, he subjectively believed Mae was an adult—Qayum did not provide the district court with any such affidavit or with any similar evidence tending to indicate that the profile photo would have been exculpatory. So, even though we agree with Qayum that it is theoretically possible for a photo like this one to be shown to be exculpatory based on its content, Qayum has not met his burden here, because there is no direct evidence (other than, of course, the State's concession that it was a photo of an adult woman) of what the photo actually looked like,[9] nor is there any evidence that

---

8. This statute was amended and renumbered after the events involving Qayum occurred. *Compare* Utah Code § 76-5-417 (2025), *with id.* § 76-4-401 (2018). We cite the previous version of the statute in the text because it was the version in effect at the time of the events in question in this case.

9. Indeed, the evidence we *do* have indicates that the full-resolution version of the photo is unlikely to have shown much, if

(continued…)

Qayum—who actually viewed the photo—was persuaded that Mae was an adult based on the photo. Thus, we have no basis to conclude, on these facts, that there was a reasonable probability that the full-resolution photo would have been exculpatory.

¶52 On this point, we are mindful of a defendant's Fifth Amendment right against self-incrimination. Even so, our supreme court noted in *Mohamud* that the defendant in that case "could have testified on his own behalf as to what the [potentially exculpatory evidence] would have shown, which would not have waived his Fifth Amendment right against self-incrimination." 2017 UT 23, ¶ 23. Indeed, the court explained that a defendant's "burden to show by reasonable probability that the lost evidence would have been exculpatory includes the duty to make some proffer as to how the [purportedly exculpatory evidence] could have potentially helped his case, even if such a showing necessitated that he personally testify in some fashion." *Id.* ¶ 24. And "courts have long recognized that upon a showing of substantial tension between a defendant's desire to testify in a hearing that adjudicates a claim of constitutional right in a criminal case and the right of that defendant not to give testimony that is incriminating as to the charge in question, defendants may offer potentially incriminating testimony without surrendering their Fifth Amendment privileges." *Id.* ¶ 23 (cleaned up). Thus, Qayum could have proffered testimony as to the exculpatory nature of the photo without surrendering his Fifth Amendment privileges at trial. Yet, without some proffer from Qayum here as to what the full-resolution photo looked like and what effect it

anything, useful. The thumbnail-size version of the profile photo mostly just shows Model's long, flowing hair; the photo does not show much of Model's face. And as the State points out, we can tell from *Qayum's* profile approximately how much of a profile photo is eliminated, on this particular app, when that photo is reduced to thumbnail size: not all that much. It is thus doubtful, on this record, whether the full-resolution profile photo would even have shown material portions of Model's face.

was likely to have on people viewing it, there exists only speculation as to whether it would have been exculpatory.[10]

¶53 Accordingly, we discern no error in the district court's order denying Qayum's motion to dismiss based on the destruction of potentially exculpatory evidence.

### III. The Rule 505 Motion to Dismiss

¶54 Qayum next argues that the district court erred when it denied his motion to dismiss regarding the State's invocation of the confidential-informant privilege with regard to Model.[11] Specifically, he argues that the court erred when it ruled that there was no reasonable probability that Model could have given testimony necessary to a fair determination of guilt or innocence. We again disagree.

¶55 Under rule 505(b) of the Utah Rules of Evidence, the "government has a privilege to refuse to disclose the identity of an informer." This rule "places a single condition on the

---

10. For similar reasons, we also reject Qayum's assertion that the deleted metadata would have been exculpatory as concerns his entrapment defense. Qayum argues that "the metadata would have shown that Mae reengaged Qayum in conversation." But even assuming that mere reengagement could constitute a basis for entrapment, the screenshots of the chat and screen recording clearly showed date stamps, and therefore evidence of whether and to what extent Agent reengaged Qayum in the conversation is already in the record. Apart from this aspect of the metadata, Qayum has not proffered any testimony—or other evidence— explaining what the missing metadata would have shown or how it would have been exculpatory.

11. Qayum does not take issue with the State's ability to designate Model as a confidential informant. So, following the parties' lead, we assume for purposes of our analysis, and without deciding, that Model could qualify as an "informer" for purposes of rule 505(a)(2) of the Utah Rules of Evidence.

unfettered exercise of the confidential informant privilege: the absence of a reasonable probability that the confidential informant can give testimony essential to a determination of the defendant's guilt or innocence." *Nielsen v. State*, 2016 UT 52, ¶ 14, 391 P.3d 166; *see also* Utah R. Evid. 505(e). "If the judge finds there is [a] reasonable probability that the informer can give" testimony "necessary to a fair determination of the issue of guilt or innocence in a criminal case" and "the government elects not to disclose the informer's identity," the court "on motion . . . shall dismiss the charges to which the testimony would relate." Utah R. Evid. 505(e)(1)–(2). In this case, the district court determined that there was "no reasonable probability that [Model could have] give[n] testimony necessary to a fair determination of the issue of guilt or innocence" of Qayum.

¶56 Qayum challenges this determination, arguing that Model could have provided testimony about "three areas of inquiry" that, in his view, would have been "relevant" to his "belief that Mae was 13 and to entrapment" and that would have been necessary to a fair determination of his guilt or innocence. First, Qayum argues that Model "could have testified about her age and whether people mistook her for a 13-year-old." For example, Qayum posits that Model could have testified as to whether she had ever been suspected of driving illegally, whether she had been asked to provide identification at an R-rated movie, or whether people asked her which middle school she attends. In short, Qayum argues that if Model did not look thirteen—or most people did not think she looked thirteen—it would cut against the State's assertion that Qayum thought she was a minor.

¶57 But the key word in rule 505 is "necessary." Even assuming that these lines of inquiry could be relevant to whether *other people* thought Model looked like an adult, it does not follow that this evidence is necessary to a fair adjudication of this case, because what ultimately mattered here was Qayum's subjective belief about Model's age. *See* Utah Code § 76-4-401(2)(b)(i) (2018) (stating that, for an enticement crime, what matters is whether the defendant has knowingly contacted "a minor or a person *the [defendant] believes to be a minor*" (emphasis added)). And, as

already discussed, *see supra* Part II, there is no evidence that—while he was chatting with Mae—Qayum believed Mae was actually an adult. In fact, ample evidence in the record demonstrates the contrary—that when Mae told him she was thirteen, Qayum did not express skepticism but, instead, simply said that, because of her age, they needed to be "very careful" if they had sex, and that, during the police interview, Qayum admitted that he thought Mae was thirteen, that he "made a mistake," that he "[j]ust lost [his] conscience," and that he did "something stupid." The district court was correct when it concluded that Model's testimony about her appearance would be "irrelevant to [Qayum's] mental state" and therefore not necessary to any adjudication of his guilt or innocence.

¶58 Second, regarding the entrapment defense, Qayum argues that Model could have testified about "the role the police played in staging the photos" and whether they "gave her instructions to create photos that may induce the crime." But Model's testimony on these points was not necessary to any determination of Qayum's guilt or innocence because Qayum could have obtained that information from the law enforcement officers involved in obtaining the photos. Indeed, Agent offered testimony along these lines at trial, telling the jury that he had obtained the photos by contacting a modeling agency and that he specifically asked for someone who "looks really young." Agent also explained that Model did not "otherwise" have "any involvement" in the sting operation that Agent was running. Counsel had the chance to cross-examine Agent, and during that examination Agent stated that, as far as he knew, Model took the photos herself (they were selfies) and that he was not present when they were taken. Counsel could have asked additional questions about any role the police played in staging the photos, and there is no reason to think that Agent would not have provided that information. Because such information was readily available from Agent, Model's testimony on these issues was not necessary.

¶59 Finally, Qayum argues that Model "may also have been able to authenticate or produce the photos which . . . were not provided to the defense." As an initial matter, there is no

indication—beyond speculation—that Model still had any of the original photos in her possession. But even if she did, Agent authenticated the existing photos at trial, and he very likely could have authenticated other photos in the same manner; at the very least, Qayum does not explain why Agent could not have done so. Under these circumstances, Model's testimony was not necessary for the purpose of authenticating photos.

¶60 Accordingly, for all of these reasons, we discern no error in the district court's order denying Qayum's motion to dismiss regarding Model's status as a confidential informant.

## IV. Motion to Suppress

¶61 Finally, Qayum argues that the district court erred when it denied his motion to suppress the statements Qayum made during his post-arrest interview.

¶62 The Fifth Amendment to the United States Constitution states that no person "shall be compelled in any criminal case to be a witness against himself." Police officers must "protect this privilege by informing an accused person of his or her constitutional rights before engaging in custodial interrogation." *State v. Dahlquist*, 931 P.2d 862, 866 (Utah Ct. App. 1997) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). These rights include "the right to remain silent and the right to have an attorney present." *State v. Medina*, 2019 UT App 49, ¶ 11, 440 P.3d 846.

¶63 Qayum's challenge here is bifurcated into two arguments. First, he argues that he invoked his right to counsel and that the interview should have terminated at that point. Alternatively, he argues that Officer proceeded with the interview without obtaining a valid waiver of his *Miranda* rights.[12] Based on these

---

12. In its brief, the State argued that Qayum failed to preserve his waiver challenge for our review on appeal. However, at oral argument before this court, the State acknowledged that Qayum had argued, before the district court, that Officer proceeded with

(continued…)

arguments, he asserts that the interview proceeded unlawfully and that statements he made during that interview should have been suppressed. We address each of Qayum's arguments in turn.

A.      Invocation of the Right to Counsel

¶64     To invoke the right to counsel, an interviewee "must unambiguously request counsel in such a way that the desire to have counsel present is sufficiently clear." *Medina*, 2019 UT App 49, ¶ 12 (cleaned up). If an interviewee invokes this right, the interview "must cease" and, "with limited exceptions," the State "may not use any statements made by the accused taken in violation of *Miranda*'s protections." *Dahlquist*, 931 P.2d at 866.

¶65     But the interviewee's invocation "must be unambiguous." *State v. Deprey*, 2024 UT App 190, ¶ 26, 562 P.3d 1246 (cleaned up), *cert. denied*, 564 P.3d 961 (Utah 2025). "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, the questioning may continue." *Id.* (cleaned up); *see also State v. Garcia-Flores*, 2021 UT App 97, ¶ 23, 497 P.3d 847 (holding that a defendant asking, "Is it, uh, possible to have a lawyer[?]" was an ambiguous request for counsel (cleaned up)); *State v. Smith*, 2019 UT App 141, ¶ 30, 449 P.3d 971 (explaining that an "ambiguous reference to counsel . . . did not require [the law enforcement officer] to stop his questioning or seek clarification of [the defendant's] intent"). Importantly, the "invocation of the right to counsel must be unequivocal in both the pre- and post-waiver contexts." *Smith*, 2019 UT App 141, ¶ 29.

the interview without first obtaining a valid waiver. And the State acknowledged that the district court made some findings as to whether Qayum understood his rights. Thus, the State offered its view that Qayum's preservation efforts had been "close enough" and that therefore the waiver argument should not be rejected on preservation grounds. We follow the State's lead on this point and proceed to address the merits of Qayum's waiver argument.

¶66    Qayum claims that he invoked his right to counsel with the following statement at the beginning of the police interview: "I have to tell my attorney to talk to you . . . to answer my questions." At first blush, and when read in isolation, it may appear from this statement that Qayum was trying to say that he wanted to talk to an attorney before answering questions at the interview. But when this statement is placed in its proper context, the better interpretation of it is that Qayum was merely affirming that he understood his *Miranda* rights—and specifically, that he understood that he had the right to counsel—and was not actually invoking them in that moment. Qayum's statement was made in direct response to Officer's request that Qayum verbalize that he understood his rights. After Officer informed him of his *Miranda* rights, Officer asked, "Do you understand everything?" Qayum nodded. But Officer then asked, "Can you tell me so?," and Qayum replied, "I have to tell my attorney to talk to you . . . to answer my questions." And when Officer followed up by asking, "So, you understand all that?," Qayum answered, "Yeah." And as the interview proceeded, Qayum answered the questions and did not appear confused that he was not given the chance to consult with an attorney first.

¶67    Thus, in context, Qayum's statement is better understood as merely an affirmation that he understood his right to counsel. It certainly was not an *unambiguous* invocation of the right to consult with an attorney. *See Deprey*, 2024 UT App 190, ¶ 26. And because Qayum simply made "a reference to an attorney that [was] ambiguous or equivocal," Officer was permitted to continue the questioning. *See id.* (cleaned up).

¶68    For these reasons, we discern no error in the district court's order denying Qayum's motion to suppress based on Qayum's purported invocation of his right to counsel.

B.    Waiver

¶69    An interviewee's waiver of *Miranda* rights is valid if "the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The "waiver must

have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and "[o]nly if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

¶70    "Absent an express waiver of these rights, an implicit waiver is valid if a person, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise." *State v. Rogers*, 2014 UT App 89, ¶ 6, 325 P.3d 884 (cleaned up). Indeed, in this context "waiver may be either express or inferred from a defendant's acknowledgment of the understanding of his or her rights and [the] defendant's subsequent course of conduct." *State v. Barrett*, 2006 UT App 417, ¶ 11, 147 P.3d 491 (cleaned up); *see also id.* ¶ 12 (noting that the defendant's "admission of guilt immediately after acknowledging that he understood his rights also supports waiver"); *Rogers*, 2014 UT App 89, ¶¶ 2, 6–7 (noting that the defendant's "conduct show[ed] an implicit waiver of his rights" and that the defendant "never refused to answer a question and never asked for a lawyer").

¶71    In this case, the district court found that Qayum understood his *Miranda* rights and proceeded with the police interview accordingly. At the evidentiary hearing on the motion to suppress, the State presented a video recording of Qayum's interview wherein Qayum could be seen nodding along as he was given his *Miranda* rights, as well as heard affirmatively answering that he understood his rights. Agent, who was in the room with Qayum as he was interviewed, also testified that Qayum was "advised of *Miranda*" before he was asked any questions. Agent explained that after Qayum was read his rights, Officer asked Qayum to "explain his rights back" to Officer "to make sure that he understood" them, and that Qayum "seemed very understanding of his rights." And Agent testified that although he "could tell that English was not [Qayum's] first language," Qayum conversed with him in English the entire interview and that any language barrier did not appear to be problematic.

¶72    From this evidence, the district court found that Qayum "never expressed confusion about his *Miranda* rights, never asked any questions about those rights, and never asked for a break or for time to think." "Instead," the court explained, Qayum "indicated that he understood the rights and then proceeded to answer . . . [Officer's] questions." Thus, the court found that "[b]y failing to invoke his rights unambiguously and by proceeding to answer [Officer's] questions without hesitation," Qayum had at least implicitly waived his *Miranda* rights, and in that situation Officer was "permitted to proceed with . . . questioning, and there [was] no basis on which to suppress [Qayum's] statements."

¶73    Based on our review of the record, including the recording of the interview, we discern no error—let alone clear error—in the district court's factual findings, and we agree with the district court's determination that Qayum understood his *Miranda* rights and waived them by proceeding with the interview.

CONCLUSION

¶74    Qayum has not carried his burden of demonstrating that Counsel rendered ineffective assistance by failing to again bring the entrapment issue before the court by motion. And the district court did not err when it denied Qayum's various motions to dismiss or his motion to suppress the statements he made during his police interview. We therefore reject Qayum's appellate arguments and affirm his conviction.

————————